92  188
e116  263
116  265
116  270

# M. E. Church, South, v. Hinton.

## (Nashville.    February 2, 1893.)

1. TAXATION. *Exemptions for charitable and religious purposes.*

The personal property of an incorporated publishing house, used in conducting its business, is exempt from *ad valorem* taxation under our Constitution and statutes exempting from taxation property held and used for purposes "purely" or "exclusively" religious, charitable, scientific, literary, or educational, where the corporation was placed by its charter under complete control of an unincorporated religious society or denomination, whose discipline provided that the entire net income arising from the business of the corporation, consisting mainly of the publication and distribution of religious literature, should be applied exclusively to the benefit of the traveling, supernumerary, superannuated, and worn-out preachers of such religious denomination, their wives, widows, and children.

Constitution construed: Art. II., Sec. 28.

Act construed: Acts 1889, Ch. 96, Sec. 2, Subsec. 2.

2. SAME. *Same. Secular use of property.*

But this exemption does not attach to property not separable in its use, *e. g.*, the outfit of a publishing house, if it has been diverted to secular purposes to any material extent, *e. g.*, the one-fifty-sixth part of its use.

3. SAME. *Same. Same.*

But this exemption is not defeated by the use of the property, viz.: The outfit of the publishing house, in printing in part secular books, etc., if the entire net proceeds of the business is applied to the religious and charitable purposes provided in the charter and discipline.

Cases cited and approved: Nashville *v.* Smith, 86 Tenn., 213; Smith *v.* Nashville, 88 Tenn., 467; University of the South *v.* Skidmore, 87 Tenn., 156; State *v.* Fisk University, 87 Tenn., 241.

4. CHARITIES. *What are.*

Property or its proceeds is devoted to a religious or charitable purpose where it is set apart entirely and exclusively for the benefit of traveling,

M. E. Church, South, *v.* Hinton.

supernumerary, superannuated, and worn-out preachers, their wives, widows, and orphans.

Cases cited and approved: Franklin *v.* Armfield, 2 Sneed, 305; Hornberger *v.* Hornberger, 12 Heis., 635; Dickson *v.* Montgomery, 1 Swan, 367; Gass *v.* Ross, 3 Sneed, 211; Young *v.* Shumate, 3 Sneed, 369.

---

FROM DAVIDSON.

---

Appeal from Circuit Court of Davidson County. W. K. McALISTER, J.

W. T. TURLEY and PITTS & MEEKS for M. E. Church, South.

Attorney-general PICKLE and W. D. COVINGTON, for Hinton.

WILKES, J.   The plaintiff is a body-corporate, doing business at Nashville, Tenn. An *ad valorem* tax was assessed upon its personal property, for State purposes, for the year 1890, at a valuation of $40,000.

The tax was paid under protest February 28, 1891, amounting to $120. Within thirty days thereafter this action was brought to recover the amount paid, on the ground that the plaintiff was a corporation created and its property used purely and exclusively for religious and charitable purposes, and hence exempt from taxation under the Constitution and Act of the Legislature.

The Court below, Hon. W. K. McAlister, Judge,. heard the case upon an agreed statement of facts, without the intervention of a jury, and, being of opinion that the tax was properly laid and collected, denied the plaintiff any relief, and dismissed the suit, from which judgment the plaintiff appealed.

It is the policy of the State, and but justice between its citizens, that all property shall be taxed, and that no property shall escape this common burden, unless it comes fairly within the exemption; and it is incumbent on the plaintiff to show that it comes within the exempting clauses of the Constitution and statute.

This Court has said in the case of *The State* v. *Fisk University*, 3 Pickle, 241: "The intention of the Legislature must govern in ascertaining the extent of tax exemptions; and when the exemption is to religious, scientific, literary, and educational institutions, the same strict construction will not be indulged in that would be applied to corporations created and operated for private gain or profit."

The fundamental ground upon which all such exemptions are based is a benefit conferred upon the public by such institutions, and a consequent relief to some extent of the burden upon the State to care for and advance the interests of its citizens.

The Constitution, Article II., Section 28, provides that "all property, real, personal, and mixed, shall be taxed, but the Legislature may except such as

may be held by the State, by counties, cities, and towns, and used exclusively for public or corporation purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary, or educational," etc.

The Act of 1889, Chapter 96, Section 2, Subsection 2, under which this tax was assessed, exempts all property belonging to any religious, charitable, scientific, literary, or educational institution used exclusively for the purposes for which said institution was created.

The terms "purely," as used in the Constitution, and "exclusively," as used in the statute, are synonymous, and mean that the property must be used wholly and entirely for such charitable and religious purposes, and exclude entirely the idea of any individual gain or profit, or, indeed, of any corporate profit, unless it is used purely for such religious and charitable purposes.

The important question raised in the case, and set out in the assignment of errors is, Was this institution purely religious and charitable in its purposes, and was the property assessed held and used exclusively for such purposes when this tax was laid?

The question is an important one, not so much on account of the amount, as of the principle involved.

The plaintiff was chartered by Chapter 136 of the Acts of 1855–6. The first section provides that "Edward Stephenson and Francis A. Owen,

and their successors in office, be, and they are hereby, made a body-corporate and politic, under the name and style of the 'Book Agents of the Methodist Episcopal Church, South;' and by that name and style to have perpetual succession for the manufacture and distribution of books, tracts, periodicals, etc., with power to sue and be sued, to hold personal and real estate, and to sell and dispose of the same as they may deem best for the interests involved."

The second section provides that the corporation shall now, and at all times hereafter, be under the control of the Methodist Episcopal Church, South, according to the laws and usages of the same as contained in their present or any future edition of their discipline.

Looking to this book of discipline, it appears, Section 229, that the object or purpose of the institution shall be to advance the cause of Christianity by disseminating religious knowledge and useful literary and scientific information in the form of books, tracts, periodicals, etc.

It is put under the control of the general book agent, and a book committee elected by the General Conference. This General Conference has power to make rules and regulations for the Church, under certain restrictions and limitations, among which is the sixth restriction rule, as follows:

"The General Conference shall not appropriate the produce of the publishing house [referring to

the plaintiff], to any purpose other than for the benefit of the traveling, supernumerary, superannuated, and worn-out preachers, their wives, widows, and children."

These provisions of the discipline, taken in connection with the charter, fix and define the purposes of the institution, and constitute its foundation. It is clear from its charter and discipline that this book concern, or publishing house, was to be used as an arm or agency of the Methodist Church in the publication and distribution of books, periodicals, and in the support of the preachers mentioned, together with their wives, widows, and children.

The volume of business done by the publishing house in 1890 was $336,800, of which about one-fifty-sixth, or $6,000, was derived from what in the agreed statement of facts is called "secular work"— that is, the printing of secular books, hand-bills, letter-heads, etc. Some of this secular work was done in the job office, and some by the other machinery in the house. It was not sought, but was done when offered, and plaintiff stood ready and willing to do any such work.

It is further agreed that all the net income or produce of the house derived from every source has been always heretofore, and was being when this tax was assessed, applied for the benefit of the persons named and described in the discipline.

It is insisted by plaintiff that the doing of this secular work was a mere incident, and that if the

13—8 P

property was thus made liable to tax, then there would have been an apportionment of values so . as to allow exemption to so much of the value as the privileged portion. represented, and, at most, the tax would have been only to the extent of the volume of the secular work compared to the entire volume of business done.

We cannot take this view. It seems that the entire property was used in doing this secular work, and, if it thereby becomes liable to any extent, the whole of it is liable.

It is not a case where the property is separable, as when several buildings belong to the same institution, one of which is used for secular purposes, and the other for purely religious or charitable purposes, and it can then be ascertained what part of the property has been used for secular purposes.

We come, therefore, to the controlling questions: (1) Whether this institution is purely religious and charitable in its purposes; and (2) whether its property has been exclusively used for the religious and charitable purposes of its creation.

The books are full of decisions showing what are and what are not charities, but a few illustrations must suffice. It is held that "gifts for the advancement of Christianity among the heathen, or for the dissemination of the gospel, or for the benefit of the ministers of the gospel, are good charities. Bispham's Equity, Secs. 112 and 119. So also is "money given to maintain a preaching

minister." Story's Eq. Juris., Sec. 1164. Gifts
for the benefit of ministers of the gospel are
charities. Perry on Trusts, p. 701. A gift to ed-
ucate, board, and clothe the children of the
donor's brothers and sisters, and their descendants,
is a charity (2 Sneed, 305); or for the education
of the poor children of Sumner County (2 Sneed,
305; 12 Heis., 635); or to educate indigent young
men preparing for the ministry (1 Swan, 367); or
for schooling the children in the bounds of Gass
school-district forever (3 Sneed, 211); or for home
or foreign missions (3 Sneed, 369).

There is a material' difference between charitable
and business corporations. In the former there are
no stockholders, and there is no element of indi-
vidual gain or profit, but a public trust.

In 2 Morawetz on Corporations, Sec. 1046, it is
said: "The charter of a charitable corporation,
like that of a business corporation, operates prin-
cipally as a law enabling the members of a cor-
poration to accomplish legally the purposes for
which they have united. But it does not embody
a contract between the corporators like the char-
ter of a business corporation. It rather embodies
a declaration of a trust—namely, the trust assumed
by the corporation in respect of the funds con-
tributed to it."

It clearly appears that this corporation was cre-
ated as an arm or agency of the Methodist Church,
a religious organization charged with the trust of
manufacturing and distributing books, periodicals,

etc., in the interest and under the auspices of that Church, and thereby raising a fund with which to support its worn-out preachers and their families. Such being the purposes of its creation, it is clearly a religious and charitable institution.

But another question remains. Has its property been held and used purely and exclusively for the purposes of its creation, and in accordance with these trusts? A short review of our decisions may aid us in arriving at a proper conclusion on the facts of this case. In the case of *The City of Nashville* v. *Smith*, 2 Pickle, 213, and of *Smith* v. *Nashville*, 4 Pickle, 467, this Court considered the question whether the city of Nashville was subject to the privilege tax imposed by the Act of 1887 upon the business of a water company. This Court held that a municipal corporation owning and operating water-works exclusively for corporation or public purposes was within the constitutional and legislative provisions; and it did not matter whether the water was furnished free or not, and that raising a fund to pay running expenses and to keep down interest upon a debt created for their erection by a sale of the water to the citizens, did not deprive it of its right to exemption. It appeared in the proof that the city had furnished water to factories located beyond the city limits, and to persons residing outside the corporate limits; but what effect this would have upon the exemption was not determined, be-

cause not raised by the pleadings, and for other reasons stated in the opinion.

In the case of the *University of the South* v. *Skidmore,* 3 Pickle, 156, the exemption to the University of the South, an educational institution, was considered in an able opinion by special Judge East. In that case, however, the exemption was based upon a provision of a charter granted before the Constitution of 1870 was adopted, and turned upon the *title* to the property rather than its use. The lands belonging to the University had been laid off into lots and streets, and leased for a term of years, with renewal option, and the town of Sewanee, consisting of several hundred houses, had been built upon the grounds. From these leases a yearly rental or income of $1,200 or $1,500 was realized and used for the purposes of the University. It was insisted that this use of the property was not contemplated by the Legislature, and leasing the property was such a parting with the title as would subject it to taxation.

The Court said: "Certainly the Legislature did not intend that the land should remain of no positive utility to its owners. The only value of the land consists in its use and adaptation. We cannot concur in the argument that the effort of this corporation to utilize its land, by leasing or renting, and thus make it subservient to the chief end and purpose of the corporation, deprives it of the exemption given by the State for the encouragement of such institution."

The case of *The State* v. *Fisk University*, 3
Pickle, 233, presents these facts: Fisk University,
a chartered institution of learning, purchased as
its permanent site three separate blocks of land,
.near Nashville, containing six or eight acres each,
and separated by streets. On the northern and
southern blocks extensive college buildings were
erected. The middle block was vacant, except two
small buildings were upon one corner of it, and
used for school-purposes. On another part of the
lot barns and stables were erected. On the vacant
portion of the lot corn, hay, and vegetables were
raised year after year. Pupils of the school were
engaged in raising these products, and received
pay for their work in board and tuition, but the
school was not in any sense an agricultural school
or founded for that purpose. The hay and corn
were .fed to stock belonging to or connected with
the institution, and the vegetables were consumed
in the mess-halls. The middle or vacant lot was as-
sessed for taxes, and they were collected under a
statute which provided for the exemption of prop-
erty belonging to an educational institution which
is actually used for the purposes for which the
institution was created.

This Court held that the exemption could not
be restricted simply to such property as was actu-
ally used in *education*, for that would embrace only
buildings, desks, and books, and would exclude
grounds, walks, play-grounds, gymnasium, infirmary,
or hospital buildings for the pupils, all of which

were necessary, and owned exclusively for school-purposes, but not actually used in education.

We have examined the decisions of the Courts of Texas, Georgia, Ohio, Illinois, Iowa, Massachusetts, and New Jersey, and find an irreconcilable conflict if not confusion of cases; but, owing to differences between the constitutional and statutory provisions of the several States and our own, they can have but little weight with us, and we must decide the case under the provisions of our own Constitution and statutes.

We are of opinion that it is too narrow a view to hold that the direct, immediate, physical use of the property of a religious or charitable institution, *in its religious and charitable* work, is essential to the exemption. Such construction would destroy the exemption in this case, even if the plaintiff had not engaged in secular work, inasmuch as it would limit the institution to the manufacture and distribution of books, etc., excluding the idea of any sale after they are manufactured with a view to realizing a profit or income which could be devoted to the benefit of the preachers, their wives, widows, and children.

These worthy persons could not subsist upon the publications, for they are neither food, shelter, nor clothing, and it is only by a sale or exchange that these necessaries could be afforded. Such a construction would require the house to engage in the production of food and the manufacture of clothing and building of houses, so that these

worthy people might be benefited by their actual physical use, or one of the main purposes of its creation would be thwarted.

Applying the same rule of construction to any of our educational or religious charities, and it would follow that the endowment fund of a college, or the sustentation fund of any church or public library, must remain unproductive, because to invest such fund in stocks or bonds, or in property producing an income, would be to engage in a secular or business occupation foreign to the purposes of its creation, and we must therefore limit the use of such fund to its simple consumption in the immediate uses of the institution. The support of none of these institutions can be had except by the use of money. Money cannot be made except by labor; and this labor is always more or less tinged with a secular character. Even the printing of the Bible or other religious books is a secular or business occupation, especially if they are to be sold. The case of *The University* v. *The People*, 99 U. S., is instructive on this point of the immediate use of the property.

Mr. Justice Miller, in construing the provision of the Constitution of Illinois, makes a broad distinction between property necessary for school-purposes and property used for schools. The Constitution of Illinois provided that the Legislature might exempt from taxation such property as might be deemed necessary for school-purposes.

The Judge said: "We think the distinction very broad between property contributing to the purposes of a school—made to aid in the education of persons in that school—and that which is directly and immediately subjected to use in the school. The purposes of a school and the school itself are not identical. The purpose of a college or university is to give youth an education. The money which comes from the sale or rent of land dedicated to that object aids this purpose; and land so held or leased is held for school-purposes in the fullest and clearest sense."

The purposes of this corporation are twofold—to publish and distribute books, etc., and therefrom to raise money to support these most worthy objects of Christian charity. We need not inquire which is the primary and which the secondary purpose. Both are indissolubly interwoven in the foundation of this institution, and the former is but a means of accomplishing the latter.

Even if we concede that the work done could not strictly be called religious, still the proceeds therefrom are wholly devoted to the charitable purposes contemplated in the creation of the institution, and the work done cannot be considered immoral or at variance with the religious feature of the institution.

It is said there are dangers to society likely to result in so holding; that a line must be drawn somewhere; that such institutions may become too rich and powerful, and menace society. In answer

to this, we say the field of charity is large, and is not likely to be overcrowded, unless some element of personal gain enters into the enterprise. Besides, no fund can ever accumulate from the operation of this institution, as the income, so soon as earned, is impressed with a direct trust in favor of this charity, which can be enforced at once; and again, if necessary, the Legislature can, if deemed important, limit the exemption in amount.

It is said, also, that evil-minded persons . may adopt the plan of obtaining charters for religious and charitable purposes in order to enrich themselves. A sufficient answer to this is, that it is agreed in this case that the proceeds have all the while been properly applied. If they are diverted to other purposes, then will be the time to lay the hand of the law upon it, and not only make it contribute to the common burden of taxation, but force it, it may be, to surrender its charter, used as a cloak for such fraudulent purposes.

It is said, also, that the great body of the Methodist people may change their organic law, and devote the proceeds of this house to other purposes. This is so; and, if it is done, then the question will arise under the change.

A sufficient answer to this is that it is agreed they have not done so, but for over thirty years the income has been devoted as was originally designed.

Again, it is said this doing of secular work will bring this religious charitable institution in

competition with those who must pay taxes; but an answer to this is that it is not the presence or absence of competition which furnishes the test, but the benefit extended to the public and fidelity to the purposes of its creation. This competition will arise whether work done is secular or religious. If nothing but religious books were published, and then distributed gratuitously, still the competition would exist from the fact that the demand for such books would, to that extent, be diminished. So with schools. If it were not for charitable schools, private and pay schools for individual profit would receive that much more patronage.

We are of opinion that the plaintiff is an institution created for both religious and charitable purposes; that the ultimate use of its property has been in accordance with these purposes; that the income and profit derived from the use of its property has been exclusively applied to religious and charitable purposes, and hence it is entitled to exemption under the provisions of the Constitution and Act; and we therefore reverse the judgment of the Court below, and give judgment here for the amounts of the tax paid, with interest and all costs.

---

### DISSENTING OPINION.

SNODGRASS, J. I cannot agree with the majority of the Court in holding this property of the corporation exempt from taxation. I do not question

the wise and beneficent purpose for which the corporation was promoted by the great religious body which now controls it, and which is a voluntary, unincorporated association; but I deny the power of the Legislature to create a corporation and put it under the control of a voluntary, unincorporated association. I think so much of the Act of incorporation as purports to do so is invalid, and that it results that the corporation created is purely a business one. As such, it is not even created for the publication and dissemination of purely religious books or literature, or to do purely religious printing or publishing. On the contrary, it is not even intimated in the corporate Act proper that it is for such purpose; and this cannot be implied from any reference to the character of its publications as authorized, except from the use of the word "tracts" employed in the Act.

The word does not admit of limitation to religious tracts, because it has no such restricted meaning. There are, it is true, religious tracts; but there are also political and other tracts; and the use of this word no more determines the religious character of its publications than does the word "books" determine that its publications shall be religious books. Besides, it is not insisted that the work of the corporation is confined to religious printing or publishing; and, in fact, it does not so limit its own work.

Further, I think it is not the purpose of the

Constitution or the exemption Act to make the exemption depend upon the purpose to which the fund raised in a business corporation or a business enterprise purports to be devoted. If so, any business enterprise may be organized, and, purporting to be an agency or auxiliary of a religious, literary, educational, scientific, or charitable institution, run free from taxation, in competition with other like institutions; and so, finally, all business in the State might be run, as competition by taxed enterprises would be driven out.

Take this illustration: A body of men desire to run a business without tax. They organize a school corporation, and then a business association, the proceeds of which they agree is to be devoted to the school purpose. The business which they organize may be a printing and publishing establishment, or any other industrial establishment, or a mercantile store. It is owned by them, and they are the corporators of the school. Their business goes tax free, and, as a school corporation, they take its proceeds. This would be a bad faith use of the law; but in strictly good faith every church, school, literary, scientific, and charitable institution may each establish any business, or number of businesses it pleases, and run them tax free if their earnings are devoted to the uses of the institution organizing it. This would put all taxed businesses in competition with these untaxed enterprises. It cannot be that any such thing was in contemplation of the framers of this

clause of the Constitution. They must have intended the exemptions to apply to actual physical holding and use for strict · necessary purposes of the holders. Thus construed, the exemption is beneficial to them and harmless to the public, and I think this construction should be given to it.