# UNIVERSAL LIFE INS. CO. v. CITY OF MEMPHIS.—103 S. W. (2d) 912.

Western Section.    March 18, 1936.

Petition for Certiorari overruled by Supreme Court, January 16, 1937.

2

William H. Foote, of Memphis, for complainant.

Walter Chandler, A. L. Heiskéll, and J. R. McDowell, all of Memphis, for defendant.

SENTER, J. Complainant filed its original bill in this cause on August 3, 1934, against the defendant, City of Memphis, by which it sought a recovery in the sum of $550.22, and interest thereon, basing said suit upon allegations to the effect that the City of Memphis had illegally assessed and collected taxes against certain real estate described in the pleadings and now owned by complainant, but which was owned at the time said taxes were assessed for the years 1928, 1930, and 1931, by a colored order known as the Tribes of Canaan of the United States of America, alleging said order to be a fraternal and benevolent society, and operating a subordinate lodge in the City of Memphis and other subordinate lodges, and that said taxes had been paid under duress and under protest by complainant.

The bill alleged that said property for said years was exempt from taxation under the laws of the state of Tennessee, because the same was then owned by a fraternal, benevolent, and charitable organization chartered under the laws of the state of Tennessee.

The defendant filed an answer by which it admitted that the taxes involved had been paid under protest, but denied that the property was exempt from taxes at the time the same was assessed for taxes for said years; and denied that the then owner of the property was a fraternal or charitable or benevolent order, but contended that the principal business of the then owner was to conduct an insurance and sick benefit company under its charter.

Before the hearing of the cause, the defendant was permitted to amend its answer so as to deny that the taxes paid by complainant covering said years was a payment made under duress or protest. The amendment was supported by the affidavit of the solicitor for the defendant, explaining the erroneous admission contained in the original answer. The amendment was allowed at the hearing of the cause. The cancellor held that the payment had been made

under protest and under duress, but further held that the owner of the property at the time the taxes in question were assessed was not engaged in any religious or charitable business so as to bring it within the exemptions from taxation, and accordingly dismissed the bill at the cost of complainant.

From this decree, the complainant has appealed to this court. On this appeal there are only two questions presented for determination. First, whether the property was exempt from taxation for the years mentioned while it was owned by the fraternal order; second, whether or not the payment of the taxes by complainant was a payment under protest or duress.

It appears that complainant is an insurance corporation chartered under the laws of the state of Tennessee, with its principal office in the City of Memphis, Tenn. In 1928, the complainant bought from the receiver for the Fraternal Solvent Savings Bank & Trust Company certain notes secured by a trust deed on real estate situated in the City of Memphis. Among the notes so purchased were those secured by a trust deed on property located on Beal avenue in the City of Memphis. This property had been conveyed to the Tribes of Canaan of the United States of America in 1927, and the notes represented unpaid purchase money. The Tribes of Canaan of the United States of America was a corporation organized and chartered under the general welfare laws of the state of Tennessee for the purposes of operating a lodge for colored people. It was incorporated in 1916. It appears that there was a Grand Lodge under the corporate name of the Tribes of Canaan of the United States of America, with subordinate lodges.

The charter of the organization recites that it was applied for and obtained under subsections 2 and 3 of section 2513, Shannon's Code (subsections 2 and 3 of section 4146 of the 1932 Code). The purpose of the charter as set out in the application in the charter recites:

"The particular purposes for which this charter is sought are: to collect and secure funds by a system of dues and assessments for the payment of sick, funeral, and death benefits for its members and their relatives and dependent representatives."

There was introduced in evidence a copy of the constitution and by-laws of both the state Grand Lodge and the local or subordinate lodges. There is a provision in the by-laws as follows:

"The object of this society shall be to care for the sick and bury their dead, and to provide means to care for the widows and heirs of the deceased members of the order."

Members were required to pay an initiation fee or a membership fee of $3.50 at the time of joining. Each member must agree to carry a benefit policy or certificate. The subordinate lodges con-

stitute two groups, apparently one for men and one for women members, referred to as Temple and Court respectively. Each Temple and Court is required to pay to the Grand Lodge 50 cents quarterly. There was also provision made for juvenile members and they were required to pay 25 cents quarterly.

The constitution and by-laws as well as the charter provides for the issuance of benefit certificates or policies to the members and it is provided that upon satisfactory proof of death of any member in good standing with all departments of the order, the Supreme Grand Treasurer shall pay the same within ninety days after such claims have been approved by the Supreme Grand Chief. Each member is required to pay an assessment of $1.00 every quarter as Grand Lodge dues. There is a provision for sick benefits of not less than $1.50 nor more than $3 per week. These sick benefits are paid by the local lodges, the Temple and the Court.

The by-laws for the government of the subordinate lodges provide for a chaplain who shall conduct devotional exercises in the Courts and Temples and to preach an annual memorial sermon. It is further provided that he is also to visit and comfort the sick of the respective tribes. The chaplain is an officer of the local lodge and not of the Supreme Grand Lodge.

Provision is also made in the by-laws for sick committees, which are required to visit the sick members of the tribes, composed of three members. The subordinate lodges are required to hold regular stated meetings, and members are required to attend the regular meetings or to furnish a valid excuse for nonattendance.

The record does not go into any considerable detail with reference to the particular activities of the local lodges, nor does it appear just how active the visiting committees were in visiting and looking after the sick. However, it will be presumed that the respective subordinate lodges functioned and pursued the activities provided and required by the constitution and by-laws of the order.

Among other contentions made by appellee is that this property belonged to the Grand Lodge and did not belong to the subordinate lodge; that whatever charitable activities were required of the subordinate lodges under the by-laws, that no requirement of the Grand Lodge was provided with respect to any charitable work.

We do not think that this contention by appellee can be sustained. We think it clear that the subordinate lodges, referred to as Temples or Courts respectively, derive their sole authority from the Grand Lodge, and that the aims and purposes of the order intended that these particular activities should be through the subordinate lodges. It is true the Grand Lodge did not maintain any institution of a charitable nature, such as a widows' or orphans' home, or one for aged or feeble members. The Grand Lodge did not

undertake to directly furnish or engage in charitable or benevolent work. This was to be done through the agency of the subordinate lodges.

We are therefore of the opinion that whatever charitable or benevolent work was done through the agency of the subordinate lodges, acting under the Grand Lodge of the order, constituted a part of the purposes and benefits of the organization, and emanated from the Grand Lodge as the parent lodge. In other words, if the subordinate lodges were required by the Grand Lodge to engage in charitable and benevolent undertakings and work, and the Grand Lodge undertook to render such services to members through the subordinate lodges, it would be constituted a charitable and benevolent organization as much so as if the Grand Lodge functioned such departments directly and not through the agency of its subordinate lodges.

We are further of the opinion that if the subordinate lodges are required by the Grand Lodge in its general organization scheme to engage in charitable, religious, or benevolent activities of a character that brings this work within the exemptions from taxation of its property, the property would be exempt from taxation whether the title thereto was in the Grand Lodge or in the subordinate lodge. It would still be a corporation organized with a purpose to serve as a religious, benevolent, or charitable society, and that its property would be exempt from taxation under the laws of the state of Tennessee.

The learned chancellor reached the conclusion that this corporation was organized primarily for insurance business and that it did not engage in any charitable work. To this conclusion we cannot agree. While it is true this order or lodge did have as one of its chief features a death and sick benefit certificate plan for its members only, and this insurance plan as well as the entire organization was for colored people only, yet it is clear from the constitution and by-laws of the order that the primary purpose was the usual lodge features and with the usual solicitude for its members. This, we think, is clearly evidenced by the fact that the by-laws specifically provided that each subordinate lodge should have a chaplain, and among the duties of the chaplain was to conduct an annual memorial or religious service for the benefit of members. The chaplain was also required to visit the sick members of the order as well as to preach an annual sermon. In addition to this, the by-laws provided for the appointment of a standing sick committee and the members of this committee were required to visit the sick members of the order.

Appellee construes this provision of the by-laws as intended to serve the purposes of the order by checking up on alleged sick

members for the purpose of ascertaining if they would be entitled to the sick benefits, under the sick benefit certificates in the form of insurance issued to members.

We do nont find anything in the by-laws or the activities of the lodge that would warrant this interpretation. To the contrary, we think it the clear intention of this provision of the by-laws that the lodge shall take a real benevolent interest in its members and to render aid and comfort to its members. We do not find that there was any actual charity dispensed by the order in the matter of supporting the sick members, except through the sick benefits in the form of insurance. This could be a charity in itself. All members of the order are thereby contributing to the aid and relief of sick members and families of deceased members.

The fact that dues are collected from the members for the purpose of creating a fund to take care of these lodge obligations does not necessarily render it any the less charitable. While each member is entitled to pay dues to the subordinate and Grand Lodge, the dues so paid results in enabling the lodge to care for its sick among the membership. These dues also enable the lodge to furnish burial services to deceased members as well as to pay death benefits in the form of insurance.

Appellee in the argument at the bar of this court and also in the brief makes the point that members are turned out of the order for a failure to pay dues, and that this negatives the theory that the order is charitable in its purposes. We do not think this contention is well taken. The order is only intended to serve its members. It does not purport to be a general 'charitable organization dispensing charity generally. Such benevolent and charitable work is confined to the members of the order. This is not unusual, but, to the contrary, it is the usual practice for benevolent and fraternal organizations to recognize its obligation to members only in administering relief, aid, comfort, and encouragement.

The claim for exemption from taxation of this property rests under the Constitution under article 2, section 28, of the Constitution of 1870. This provision is as follows:

"All property, real, personal or mixed, shall be taxed, but the Legislature may except such as may be held by the State, by counties, cities or towns, and used exclusively for public or corporation purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary or educational."

In the case of Cumberland Lodge, etc., v. Nashville, 127 Tenn. 248, 154 S. W. 1141, 1144, we have a very comprehensive discussion and construction of this constitutional exemption and the power of the Legislature and also of the Acts of 1907, chapter 602.

In that case the court commented upon the difference in the

Constitutions of 1796 and 1834, and the Constitution of 1870 on this subject and especially with reference to legislative authority, and points out the wider range of discretion allowed to the Legislature by the provision contained in the Constitutions of 1796 and 1834, respectively, citing State v. Bank of Commerce, 95 Tenn. 221, 226, 31 S.W. 993; it being further pointed out that article 2, section 28, of the Constitution of 1870, placed limitations upon the Legislature, whereby the Legislature was thereby prohibited from granting any other exemption than such as was authorized by the Constitution; Nashville & R. R. Co. v. Wilson County, 89 Tenn. 579, 608, 15 S. W. 446, and authorities there cited.

In the Cumberland Lodge Case the court commented at some length on the peculiar activities of the Masonic Lodge and that Cumberland Lodge was a subordinate lodge of the Grand Lodge of Free and Accepted Masons of the state of Tennessee from which the Cumberland Lodge secured dispensation and a charter.

It was pointed out that Cumberland Lodge held its regular meetings in Nashville, since its first organization; that it worked under its by-laws and under the Grand Lodge of Tennessee; that it was incorporated under the laws of the state of Tennessee; that its charter of incorporation contained no provision exempting its property from taxation. Its claim of exemption is based on the authority conferred on the Legislature by the above-quoted section of the Constitution of 1870, and upon what it insists was an exercise of that authority by legislative act.

In that case the court construed chapter 602 of the Acts of 1907 and subsection 2 of section 2 thereof, which provides:

"All property belonging to any religious, charitable, scientific, or educational institutions when used exclusively for the purpose for which said institution was created, or is unimproved and yields no income. All property belonging to such institution used in secular business and competing with a like business, that pays taxes to the State shall be taxed on its whole or partial value in proportion as the same may be used in competition with secular business."

On this question as to whether the Cumberland Lodge came within the tax exemption provision of the statute and Constitution, the court said:

"Membership in the complainant lodge is extended only to such worthy male white persons, 21 years of age, as come under the requirements of the order, and who are unanimously elected. Its halls are not open to the use of the general public, but are open to all members of the fraternity who may visit Nashville. The wives and female relatives of members that come under Masonic requirements are eligible to membership in a collateral order, known as the Eastern Star lodge, and complainant permits the use of its halls by these

lodges, when its halls are not in use by other Masonic lodges who have rented the same.

"Complainant keeps a Masonic library and reading room for the use of Masons. Complainant is supported by initiation fees and annual dues, and not by gifts, assessments, or donations.

"The purposes of complainant are admitted by the stipulation to be as follows:

"First. Ethical and fraternal teaching, patriotism, benevolence, and orderly moral life, to the end and for the purpose of improving its members and extending the influence and blessing of Masonry thereby.

"Second. To assist in the support and maintenance of a widows' and orphans' home by contributions to the Grand Lodge, which lodge in turn supports the home, and which home is also further contributed to by direct appropriations made by the complainant, not through the Grand Lodge. Complainant's further purpose and work is to assist needy masons and needy masonic lodges.

"Third. It is fairly inferable from other facts stipulated that one of the steady purposes of the complainant, since its creation, has been to provide for the welfare and comfort of its own members, and those of other lodges, by providing comfortable lodge rooms and meeting places to the end that the work of the lodge may grow and prosper along the lines indicated as its first and second purposes heretofore."

Later in the opinion the court said:

"The second and last question is whether or not the complainant, upon the proof in this record, may be said to devote all of its profits to any one or more than one of the four objects named in the Constitution and in the statute. If it does, then, under the authority of M. E. Church, South, v. Hinton [92 Tenn. 188, 191, 21 S. W. 321, 322], it is exempt from taxation."

The court then proceeds to a discussion of the real activities of the Masonic Lodge and states:

"An educational institution, within the meaning of the Constitution and the act of 1907, is one which teaches and improves its pupils. One of the admitted purposes of the complainant lodge is the teaching of patriotism, benevolence, and orderly moral life, for the purpose of the improvement of its members and the extension of the influence and blessings of Masonry. The store and range of information of Masonry as an educational institution must of necessity be extensive, for it is common knowledge that its origin is ancient, antedating by many centuries the first principles of the common law and our system of equity jurisprudence. It is not, we think, a far cry to hold that one of the purposes of complainant institution is educational. Its second purpose is the support and

maintenance of a widows' and orphans' home, and the assistance of needy Masons and needy Masonic lodges. That this purpose is charitable we have no doubt. Its two purposes, as we find them, are educational and charitable.

"The maintenance by it of its reading rooms and its lodge rooms, and the effort by it to secure for itself a permanent home, are but agencies for the advancement and enlargement of the two general purposes above set out. The same may be said of the entertainments which it affords its members. That its purpose is free from the taint of individual profit, and that it is not an institution for private gain, that it has no capital stock, and declares no dividends, are facts which, upon this record, cannot be controverted."

Applying the reasoning of the court in the Cumberland Lodge Case to the facts of the present case, we find that the record in the present case does not contain a stipulation of the social, benevolent, educational, religious, and charitable activities of the Tribes of Canaan of the United States of America.

While it is certain that it does not have the history and antiquity of the Masonic Lodge, and it does not have for its purpose the support and maintenance of widows' and orphans' homes for the benefit of dependents of Masons; however, if we are to gather the peculiar activities and purposes of this colored lodge from its charter, constitution, and by-laws, we cannot escape the conclusion that it has the usual features of a fraternal benevolent society. Its membership is composed entirely of colored people with the usual lack of opportunities that go with colored societies of this type. It holds regular stated meetings, and its members are expected to attend these meetings. These meetings are fraternal in character.

It has the usual provisions of fraternal and benevolent societies for looking after sick members and administering comfort and encouragement to its members. It has certain religious features. The chaplain, by specific provision, is required to minister to the members of the order by visiting the sick members and by delivering an annual sermon to the members. The interworkings of the order are not disclosed by the record very fully, but we think it fair to assume from the entire record that this colored lodge was engaged in the usual fraternal and benevolent and lodge activities in the usual way and manner that such fraternal orders are conducted. This appears from the charter, constitution, and by-laws, both of the Grand Lodge and of the subordinate lodges.

It used this property for lodge purposes exclusively and so far as the record discloses, did not derive any revenues from the property. While it is true one feature of the lodge was to insure sick benefits and burial to members out of dues collected from members only, it was not a profit-making corporation, and was not organized

as such, but was organized under the public welfare charter and was a nonprofit-bearing institution.

We think that to this extent its social duties to its members were intended to be helpful to its members and to the colored race. If it tended to improve the moral ideals and to command higher standards of moral living, and this was the main purpose of the organization, we cannot see that it would not be governed by the same legal principle which was referred to by the court in the Cumberland Lodge Case.

We are therefore of the opinion that the learned chancellor was in error in holding and decreeing that the property of this colored lodge was not exempt from taxation under the constitution and laws of the state then in force, and that the assessment for taxes of this property, while it was owned and used exclusively for lodge purposes by this colored order, was illegal, and that the property was not subject to either state, county, or municipal taxes.

This leaves the further question with respect to whether the payment of the taxes under the facts as disclosed by the record was a voluntary payment or whether it was a payment under protest or duress.

The learned chancellor filed a finding of the facts and an opinion, which is contained in the record. In the finding of the facts and in the opinion, he held that the payment was made under protest or duress, and if the taxes had been illegally assessed, that complainant would be entitled to recover the amount paid.

This question is not entirely free from confusion in this state. The general rule is that if taxes illegally assessed are voluntarily paid, that the taxpayer cannot maintain an action to recover. If the payment is made under protest or duress, the taxpayer may maintain his suit to recover the amount so paid.

The question as to what constitutes a payment under protest or duress has been frequently before the courts, both of this state and of other jurisdictions.

In the present case, there is no material conflict in the evidence as to what occurred at the time the taxes were paid by complainant on this property.

It appears that Mr. Charles M. Bryan, an attorney of the Memphis bar, was representing the complainant in the matter of procuring a loan from the Re-Finance Corporation Agency of the federal government. He had experienced some difficulties with the local administrative authorities in the matter of procuring this loan on the collateral offered. In this situation he made a trip to Washington on this and other business, and while there, took the matter of this loan up with the Washington authorities and was promised the loan for his client. Upon his return to Memphis, he stated that

there was some apparent feeling resulting from his having taken the matter up directly with the Washington authorities, and over the heads of the local administrative agents, and that because of this, notice was served upon him and his clients by the local authorities that unless he presented his collaterals and completed the loan promptly that the authority for making it would be canceled.

As a part of the collaterals offered to the Re-Finance Corporation was a trust deed or mortgage on the property involved for taxes in this suit. The Re-Finance Corporation required that the record show that all taxes against the property had been paid and that the tax record was clear. On investigation it was found that the property had been assessed for taxes for the three years mentioned when the property belonged to the Tribes of Canaan of the United States of America.

Mr. Bryan testified that in this situation he went to the commissioner of finance of the City of Memphis and sought to convince him that the property was not subject to taxation during the years for which it had been assessed, and sought to obtain a release of these taxes from the commissioner of finance of Memphis, but was unsuccessful. He testified that the commissioner of finance disagreed with him with reference to the property being exempt from taxes, but suggested that he file a petition with the city commissioners asking for the refund.

Mr. Bryan had explained the importance of speedily clearing the tax record to the end that the loan could be promptly closed, and explained to the commissioner of finance of Memphis the importance of having the tax record promptly cleared, and that the application for the loan would be canceled by the Re-Finance Corporation if he had to proceed by way of petition before the commissioners for the relief.

He stated that there was no formal payment under protest, but that it was understood between him and Mr. Gates, the commissioner of finance, that he was to make the payment in order to meet the exigencies thus created, and then filed his petition for a refund of the same before the city commissioners, and in this situation the taxes for the years mentioned were paid. Mr. Gates filed an affidavit in the form of a statement, which, by stipulation, was treated as a deposition. His statement fully corroborated the statement of Mr. Bryan with respect to the matter.

In this situation, we think that this was a payment under duress and protest, even though the tax receipts did not recite that the payment was made under protest.

We think this comes squarely within the rule stated in St. Louis Basket & Box Company v. Lauderdale County, 146 Tenn. 413, 241 S.W. 99, and cases cited, wherein it was held that under the statute

the tax books for delinquent taxes become an execution in the hands of a tax collector as much so as if a distress warrant had issued.

We think that the chancellor correctly held that the taxes were paid under protest or duress under the circumstances above stated and was not, therefore, a voluntary payment.

It results that the decree of the chancellor will be reversed and a decree will be here entered in favor of complainant and against the defendant for the amount of the taxes paid, $550.22, with interest thereon since the date of the filing of the original bill and the costs of the cause, including the cost of this appeal.