Odd Fellows Benevolent & Charitable Ass'n *v.* City of Nashville.

(*Nashville,* December Term, 1937.)

Opinion filed April 2, 1938.

ELKIN GARFINKLE and LOUIS FERGUSON, both of Nashville, for complainant.

J. WASHINGTON MOORE, JACK KEEFE, ROBERT L. ALEXANDER, JR., K. T. McCONNICO, JR., and M. S. Ross, all of Nashville, for defendant.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

The Association filed this bill seeking to enjoin the City from collection of municipal taxes for the year 1934 on a large office building, located on Seventh avenue in Nashville, known as the Medical Arts Building, some eight or ten floors being rented to various tenants as offices and stores, alleging that the property was exempt from taxation under Code, section 1085. This section reads as follows:

"(2) Property of religious, etc., institutions.—All property belonging to any religious, charitable, scientific, or educational institutions, when used exclusively for the purpose for which said institution was created, or is unimproved and yields no income. All property belonging to such institution used in secular business and competing with a like business that pays taxes to the state shall be taxed on its whole or partial value in proportion as the same may be used in competition with secular business."

It appears from the bill and proof that Walter F. Nelson and four associates, who were members and former

officers of the Order of Independent Odd Fellows, but who did not act in their official capacity, but as individuals only, applied for, and were issued, a charter under the laws of this state as a general welfare corporation, with the following declared purposes:

"(1)  To support and maintain aged, infirm and indigent Odd Fellows, holding membership within the territorial jurisdiction of the Grand Lodge of Tennessee of the Independent Order of Odd Fellows; to support and maintain the indigent widows of Odd Fellows who died holding membership in the Order within such jurisdiction; and to care for, support, protect and educate the orphan children of Odd Fellows who died holding membership in the Order within such jurisdiction; and,

"(2)  To support, and assist in the work of the Tennessee Odd Fellows Widows and Orphans Home, and of other institutions, having, as their aim, objects included in the above stated purposes, which may be designated therefor by the Grand Lodge of Tennessee of the Independent Order of Odd Fellows:

"(3)  To receive, accumulate, hold and administer funds and property for the above stated purposes; and,

"(4)  To own and maintain suitable meeting place for the fraternal sessions of the Grand Lodge of Tennessee of the Independent Order of Odd Fellows."

It appears that application for this charter was signed on the 8th day of January, 1934, and recorded on the 9th day of January, 1934; that on this 8th day of January a deed was executed in St. Louis, Mo., to this Association by the General American Life Insurance Company, recorded in Davidson county on the 10th of January, conveying to this Association, then in process of formation, the property above described for a total consideration

of $420,000, evidenced by a five-year note of the Association (no payment being made in cash), secured by a vendor's lien, and, contemporaneously, the Association reconveyed the property to an officer of the Insurance Company, as trustee, additionally to secure the payment of the purchase money. The Association had no assets or resources whatever, and under the organization as formed by the incorporators no dues or assessments or other sources of revenue were to be paid in by the members. The property, which had been acquired by the Insurance Company some years before by, or following, foreclosure of a large mortgage, was regularly assessed for taxes as of the 10th day of January, the period fixed by law, and it is the taxes thus assessed that are sought to be enjoined. It appears from testimony of an attorney acting in the matter that the closing of the transaction was timed with a view to consummation before the 10th of January, the date fixed by law for tax assessments to take effect.

The contract provided for interest at 4 per cent. per annum, payable monthly, and for a minimum payment on the principal debt of $10,000 a year. The City taxes for the year amounted to $7,165.40, and if state and county taxes are added (not sought to be enjoined herein, but liability for which will be indirectly determined in this cause), the total taxes for the year exceed somewhat the annual payment of the $10,000 minimum on the principal debt of the Insurance Company.

The answer of the City denied the right of the complainant to the exemption claimed on the facts appearing, denied that the property was being used for charitable or other purposes within the purview of the statute, and challenged the good faith of the complainant and the In-

surance Company as a manifest effort to avoid just taxation. Proof was taken, and the chancellor heard the cause and dismissed the bill. He filed an opinion reviewing the facts, and, while acquitting the organizers of complainant Association of actual fraud, or bad faith, he found that the Association "had no assets whatever at the time it was organized, the purpose being to acquire this building and devote the income therefrom primarily to paying for the building with the view of using surplus funds in the future for charitable purposes"; that "an exemption may not be determined by the character of the charter of the corporation owning such property"; that the law exempts "property of a charitable corporation when used for the purposes for which it was incorporated, and from the record in this cause it is manifest that the main purpose of the organization was to acquire this property and use the *net rentals* for the purpose of paying for it at the rate of at least $10,000 per annum in addition to the interest monthly."

The bill herein was not filed until October, 1934, and the proof showed that at that time a donation of $750 had been made from the earnings of the property (out of gross rentals of approximately $4,000 per month), but that at that time the Association was in default for several months on its monthly interest payments to the Insurance Company of some $1,400 a month.

This office building had, since 1930, been operated by the Insurance Company owners as a business investment, with just what net result does not appear, but inferentially at a loss. It is not clear from the record from what source came the first suggestion of the plan of organizing a general welfare corporation and transferring the property to it, with the effect of freeing it from taxes. It

appears that a deficiency judgment in a large sum was entered against the Grand Lodge of Tennessee, the former owners and mortgagors, when foreclosure took place in 1930. This Grand Lodge became insolvent and subsequently withdrew from the state. The first documentary evidence we find in the record on the subject of the negotiations leading up to the closing of the transaction, in January, 1934, is a letter dated November 20, 1933, addressed to Mr. J. G. Driscoll, assistant secretary, General American Insurance Company, St. Louis, Mo., headed, "Re: Medical Arts Building," and the opening paragraphs reading as follows:

"Your letter of November 4, 1933, setting forth proposed terms of sale of the above property, has been considered by a group of Odd Fellows interested; and they believe that some satisfactory plan may be reached through negotiations. As your proposal was deemed impractical, from the standpoint of both purchaser and seller, we desire to propose the following plan for your consideration:

"A charitable corporation, to be known herein as the Purchaser, will be formed under the provisions of section 4146 (2) of the Code of Tennessee (1932), with the approval of the Tennessee Odd Fellows Home Board of Trustees, and other interested officials of the order, for the purpose of acquiring, holding and operating the above building, for the exclusive benefit of the Odd Fellows Widows and Orphans Home.

"Such corporation, under existing laws and decisions of our Supreme Court, would be tax exempt.

"Sec. 1085(2), Code of Tennessee (1932); *Cumberland Lodge* v. *Nashville,* 127 Tenn., 248, 154 S. W., 1141;

*"Methodist Church* v. *Hinton,* 92 Tenn., 188, 21 S. W., 321, 19 L. R. A., 289.

"Seller, General American Life Insurance Company, by instruments prepared by, and satisfactory to itself, will release to the Grand Lodge of Tennessee of the Independent Order of Odd Fellows, all claims which Seller may have against said Grand Lodge growing out of the construction or financing of said building, including any claim for deficiency under the first mortgage bond issue, both as to principal, interest and cost of foreclosure; and will cancel and surrender to said Grand Lodge the entire first mortgage bond issue. Seller will also convey to purchaser a good title to the above property and to the personalty in, and used by Seller in connection with the operation of said building, and will transfer and assign to Purchaser all rent notes, and contracts outstanding against said building.

"Purchaser will pay therefor $400,000 (later raised to $420,000.00) to be represented by a note for said sum, payable on or before five years after date, and drawing interest at the rate of four per cent. per annum, payable monthly. Said note to be secured by a deed of trust, providing for acceleration of maturity of said note, maintenance and repair of, and insurance on, the building, and power of sale upon default, in some usual form acceptable and satisfactory to Seller."

This letter proceeds to set out other details of the plan, relating mainly to securing the payments of the purchase money, etc.

It will be seen that: (1) This letter was in response to one (which was never produced) of November 4th, proposing a sale, etc.; and that (2) emphasis is put on the tax exemption which the plan would secure, even giv-

ing citations to the Code section and decisions of this court. Also, it appears that the Insurance Company was to release its deficiency judgment, etc., claims against the former mortgagors. In other words, it would release this claim and convey the building and receive a note, secured by mortgage on the building of a corporation wholly without assets or sources of revenue. Upon even a superficial analysis it seems plain that the only consideration or benefit of any consequence at all accruing to the Insurance Company in this unique transaction was the saving in overhead costs of maintenance and operation of its unprofitable investment to result from the proposed tax exemption, in the sum of $10,000 or more annually. From figures produced on the hearing showing the results of operation of the building for the first eight months of 1934, it appears that the income from rentals fell short, if tax charges had been included, as they were not, at the rate, approximately, of nearly $1,000 a month. The chancellor refers to many of these facts in his opinion, which he concludes as follows:

"The Court therefore finds that complainant company is using the income from this property mainly not for charitable purposes, but for the purpose of acquiring its ownership, and that an intention to use same at some uncertain time in the future for purposes which will render it exempt from taxation under the law, does not preclude its taxation before it is actually being used for a purpose warranting an exemption. Whether or not the property is used for purposes which will exempt it is the determinative question and not simply the fact that the owner is a corporation chartered for charitable purposes, and not for profit.

"The Court does not consider that the fact that the

complainant made donations to the Odd Fellows Home at Clarksville, in the face of the default in the payment of its obligations under the deed of trust, is sufficient to establish that the income from the property is used for charitable purposes.

"The facts as shown by this record and hereinbefore set out, present a case of constructive fraud, and if such a situation were approved by the Court the result would be that many similar situations would arise through which efforts would be made to have property exempted from taxation and the amount thus saved be used toward paying the purchase price. This the Court cannot approve."

The Court of Appeals reversed the chancellor and this court has granted *certiorari* and heard argument.

The Court of Appeals thus states the questions presented: "Is the Complainant a charitable corporation, and is the income from the building being devoted exclusively to charitable purposes?" The opinion sets out most of the facts hereinbefore shown, and sets forth, as part of the history of the property and building, that it had formerly been owned by the Grand Lodge of the Independent Order of Odd Fellows, which had mortgaged it to the Missouri State Life Insurance Company for a large sum and following default had lost it by foreclosure in 1930; that thereafter the title had passed to the General American Insurance Company, which had owned it for some years and in January, 1934, as hereinbefore shown, had conveyed it to complainant. The opinion of that court was that because (1) the declared purposes of the corporation as expressed in the charter were charitable, (2) the incorporators were men of integrity, without interest in the Insurance Company, and (3) the in-

corporators could not lawfully have any personal interest in the assets of the corporation, the complainant was and is a charitable corporation, within the contemplation of our exemption statute; that on this point, "the case is governed by the case of *Cumberland Lodge* v. *Nashville,* 127 Tenn., 248, 154 S. W., 1141." The holding in that case was that (1) a Masonic Lodge with the purposes shown is an educational and charitable institution within the exemption statute, and that (2) the mere fact that such an institution rents out property owned by it does not deprive that property of the exemption benefits of the statute. The opinion in that case also strongly re-emphasizes the requirement that in order for the exemption to apply, the property must be used wholly and exclusively for one or more of the purposes of its being. Consistently with the holding in this case, it may be that, in form and corporately declared purposes, this complainant is a charitable institution; but this is not enough—the property must belong to it and must be wholly used by it for charitable purposes to be tax free.

Responding to the second of the questions said in its opinion to be determinative, that court reviewed our cases and concluded that, "all of the income in the end goes to charity; hence we think the property is exempt from taxation for the year 1934."

We are unable to agree with the learned Court of Appeals. We are of opinion that tax exemption under our statute cannot be applied to the property in question under the facts of this case, for more than one reason. As before seen, our exemption statute, Code, section 1085, (2), reads: "All property *belonging* to any religious, charitable, scientific, or educational institutions, when

*used exclusively* for the purpose for which said institution was created," etc. (Italics ours.) It must both belong to and be used exclusively for the named purposes by the institution in order to be exempt.

1. This property did not in fact belong to the complainant in any real or substantial sense contemplated by the statute. The transfer to it was hardly more than a form. The court looks through form to substance. No consideration was paid. A deed was executed, but the legal title was contemporaneously placed in a representative of the vendor Insurance Company. While a right of possession was nominally passed to the complainant, this was hedged about by provisions for continuing supervision, reports and control, and for complete, immediate repossession upon any degree of default, either in payment of monthly interest, or otherwise. With one hand the Insurance Company gave the property, with the other reclaimed it. All rights and interest were subject to the priority rights of the Insurance Company, the actual owner in real interest. The complainant was wholly without financial means or responsibility, or any independent sources of income whatever. It had no means of paying anything for the property, except as the property itself earned it, and any prospect of substantial interest in, or income to complainant from, the property was a distant speculative possibility of years to come. This is not a real ownership such as our exemption statute contemplates.

2. Again, we find no sound basis, upon analysis, for the claim that this property was being used for charity. (Complainant makes no pretense of being a religious, scientific, or educational institution.) It is true that under its broad charter powers any net income it had might

be so applied at the election of its governing board, but by the terms of the contract the Insurance Company was to receive all of the income, unless the net earnings of this building should exceed limits prescribed which would absorb practically all that might reasonably be anticipated over many years; certainly, if this competitive office building operation was required to bear its proportionate tax charge, there would be no possibility of revenue above the carrying charges, interest, and minimum payments on principal to the Insurance Company. Indeed, this curious situation results, if this claim of tax exemption is allowed. The annual installment payable on the principal note of the vendor Insurance Company is $10,000. The annual tax charge, city, county, and state, is $10,000, and probably a little more. In other words, by the unique arrangement that has been worked out, the city, county, and state contribute annually the sum paid to this foreign Insurance Company on its debt. It is hardly conceivable that our lawmakers contemplated a construction and application of this exemption statute which would so work. It is unnecessary to question or consider the motives of the organizers of complainant. A plan which results so unreasonably and unfairly cannot be approved. As suggested in an opinion of the Supreme Court of Mississippi, discussing a somewhat similar case (*Senter et al.* v. *City of Tupelo,* 136 Miss., 269, 101 So., 372), if this plan is within the law, then all the office buildings, and, indeed, other buildings in the City, might, by the simple expedient of placing the title in a dummy organization under a general welfare charter, avoid payment of taxes.

In this Mississippi case, supra, municipal taxes were involved and exemption claimed under a statute ex-

empting all property "belonging to any . . . benevolent order on the lodge system where no dividends are declared and where the revenues thereof are used for fraternal and benevolent purposes," etc. The building was a three-story structure, one floor to be used as a Masonic hall, and the other two rented out for offices and stores, the rentals to be used in making the deferred payments on the purchase price of the property. Rejecting the claim to exemption, the court said: "The revenue derived from the renting of these stores and offices is used for a business purpose; namely, applied in payment of the balance due on the purchase price of the property. This use is not for fraternal and benevolent purposes," citing *Gunter* v. *City of Jackson,* 130 Miss., 637, 94 So., 844.

In *Summunduwot Lodge, Odd Fellows,* v. *Spaeth,* 81 Kan., 894, 106 P., 1077, 1079, there was a like holding on quite similar facts. A three-story building was partly used for lodge quarters and partly rented out. The court said: "it appears . . . that at least a portion of the rents derived are not devoted to charitable purposes, but a portion thereof is applied to paying for the property in question. The portion of rent so applied is accumulation and profit, and . . . it cannot be said that the rents are applied exclusively to benevolent and charitable purposes." The instant case differs from these in that here not a portion only, but all the rentals are applied in payment for the property.

Cases from other jurisdictions might be cited to the same effect, some of which are referred to in the annotations in 34 A. L. R., 641, 62 A. L. R., 328, and 83 A. L. R., 773.

The governing principle is thus laid down in Cooley

on Taxation (4 Ed.), vol. 2, section 687, pp. 1441, 1442:
"An intention to use property at some uncertain time in
the future for purposes which will render it exempt from
taxation under the laws of the State, does not preclude
its taxation before actually used for the purpose war-
ranting an exemption. If the use determines the right
to exemption, [which is true under the Tennessee stat-
ute], it is the present use and not the intended use in the
future which governs."

This court has considered the question of exemption
of property owned by educational and like institutions
and rented for profit by them, but we have no case on
its facts at all similar to the one now before us. Among
these are *State* v. *Fisk University,* 87 Tenn., 233, 242, 10
S. W., 284; *M. E. Church, South,* v. *Hinton,* 92 Tenn.,
188, 190, 21 S. W., 321; *Vanderbilt University* v. *Cheney,*
116 Tenn., 259, 94 S. W., 90; *Cumberland Lodge* v. *Nash-
ville, supra;* and others. In these cases the net income
was applied to the educational, literary, scientific, or
charitable objectives of the institutions owning and op-
erating the properties; or the physical property was it-
self occupied and used in the religious, scientific, literary,
educational, or charitable work which was the objective
of the institution or organization. In no case was there
doubt or question as to the property "belonging to" the
institution in a real sense, and in no case was practically
all the rental income derived from the property used
not for charity, or education, etc., but to acquire by pur-
chase, and pay for a competitive business profit earning
investment.

The decree of the Court of Appeals is reversed and the
bill dismissed.