216

CITY OF NASHVILLE et al., Appellants,

*v.*

GIBSON COUNTY et al., Appellees.

(*Nashville*, December Term, 1956)

Opinion filed December 7, 1956.

Rehearing Denied February 8, 1957.

RAYMOND LEATHERS, City Attorney, FARRIS, EVANS & EVANS, Nashville, for appellant City of Nashville.

FRANK B. GIANOTTI, JR., FRIERSON M. GRAVES, JR., Memphis, for appellant City of Memphis.

JAMES L. BOMAR, JR., Shelbyville, for appellant Tennessee Bureau of Aeronautics.

E. T. PALMER, Dyersburg, for appellee Dyer County.

MARION H. HOLMES, JR., Trenton, for appellee Gibson County.

ALLISON B. HUMPHRIES, Solicitor General, MILTON P. RICE, Assistant Attorney General, for appellee Attorney General.

HOOKER, KEEBLE, DODSON & HARRIS, Nashville, for appellee Madison County and other intervening counties.

HOOKER, KEEBLE, DODSON & HARRIS, Nashville, and CAMP & CAMP, Sparta, for appellee White County.

Mr. Justice Swepston delivered the opinion of the Court.

The appeal is directly to this Court on a stipulation of facts. The contest is between the counties of the State on the one hand and certain municipalities operating airport facilities on the other hand. The Chancellor in a very comprehensive opinion held in favor of the counties and hence the cities have appealed.

As appears from the stipulation of facts and from the case of *Esso Standard Oil Company v. Evans,* 194 Tenn. 377, 250 S.W.2d 569, which case was affirmed on May 4, 1953, by the United States Supreme Court, a sum of about $4,000,000 was collected for the period from January 1944 through June 1946, from Esso Standard Oil Company under Williams' Code, Sec. 1126 et seq., which is the State Gasoline Privilege Tax, by reason of the storage by Esso in the State of Tennessee of gasoline belonging to the United States.

It further appears that during the war years this was high octane aviation gas purchased by the United States at refineries outside the State of Tennessee, which was transported from Louisiana in barges to the port of Memphis where it was then pumped by Esso from the barges into storage tanks, or in some cases tank trucks, and thereafter delivered to various Army posts on order of the United States, some being within and some outside Tennessee. Title to the gasoline passed to the United States at points outside the State of Tennessee and no part of the gasoline was ever sold by the United States. Some of the air force bases in this State to which some of this gasoline was sent were located at municipally-owned airports and used by the United States air force pursuant to contract between the United States and the municipality.

The counties base their claim upon Williams' Code, section 3291.1 et seq., relating to county-aid funds and especially on section 3291.2, which provides as follows:

"3291.2. County aid funds; parts of gasoline tax used.—From the revenue derived from the tax for the privilege of selling and/or distribution and/or storing gasoline, commonly termed the 'state gasoline tax,' a sum equivalent to that derived from the levy of two cents (2c) for each gallon of gasoline is (hereby) provided for and set aside into a separate fund to be used exclusively as 'county aid funds.' (1931, Ch. 45, sec. 2.)

(The other 5/7 of the 7-cent tax to go to the Highway fund of the State.)"

On the other hand, the municipalities operating airports claim under the statutes relating to the Tennessee

Bureau of Aeronautics and especially under Williams' Code, section 2726.37 as amended by section 2726.48, 1950 Code Sup., which provides as follows:

"2726.48. Tax on motor fuel *sold* for aviation; other taxes and fees; allocation.—From the general highway funds in his hands the commissioner of highways and public works shall, on or before the 10th day of each month, through proper accounting facilities, place to the credit of the Tennessee Bureau of Aeronautics an amount equal to seven cents for each gallon of motor fuel *sold* for aviation purposes exclusively at every airport or landing field licensed under the provisions of this article or operated by or under the authority of any governmental subdivision of this state.

"Of the funds so allocated by the commissioner of highways and public works fifty per cent thereof shall be used by the commission for the purpose of carrying out the purposes of this article as herein described and the remaining fifty per cent of said funds shall be returned to the counties, municipalities or other political subdivisions in proportion to the amount of said taxes collected from each of the airports controlled and operated by said counties, municipalities or other political subdivisions, and shall be used by them in connection with their respective aeronautics program.

"Funds so returned shall be held apart and not be co-mingled with other funds of said counties, municipalities or other political subdivisions and such funds shall be used solely for carrying out the aeronautics program of said political sub-division. The Tennessee Bureau of Aeronautics is empowered and

directed to enforce compliance with the provisions of this article.

"Every person engaged in the sale of motor fuel used exclusively for aviation purposes shall make a separate report of the amount of such gasoline so sold, which report shall be made in triplicate, one copy thereof to be sent to the commission, one to the commissioner of finance and taxation and one to the commissioner of highways and public works.

"All taxes on aviation or aeronautical facilities, operations, or business, or any special fees for participation in any phase of aeronautics collected by the state shall be transferred by the treasurer of the state to the department of highways and public works and by it placed to the credit of the bureau to be used solely for the purpose of advancing the aviation program in the state and for no other purpose. (1937, ch. 305, sec. 15; 1939 ch. 195, sec. 3; 1945, ch. 72, secs. 2, 5.)"

The principal contentions of the respective adversaries is clearly and succinctly stated by the Chancellor as follows:

"First, both the county and the State officials insist that the Bureau of Aeronautics law provides that only that amount of tax on gasoline *sold* for aviation purposes exclusively is allocable to the Bureau and to political subdivisions controlling and operating airports; that there is no ambiguity in that statute, and it must be read literally to mean that the amount of tax money allocable to the Bureau and said political subdivisions is thereunder confined solely to that derived from the sale of gasoline for aviation purposes exclusively; and since none of the gasoline involved

was in fact sold for aviation purposes, or any other purposes, none of the tax collected thereon is allocable to the Bureau and said political subdivisions under the Bureau of Aeronautics law. In addition, the State officials also insist that under the Bureau of Aeronautics law, the political subdivisions were entitled to share in said funds only 'in proportion to the amount of said taxes collected from each of the airports controlled and operated * * *,' and that under the literal meaning of this language in the statute unless the tax is collected from the airport itself no portion thereof is allocable to said political subdivisions.

"Secondly, the Bureau of Aeronautics in the two cities, which are parties to this cause, insist there is ambiguity existing, not by virtue of any confusion or indefiniteness in the language of the statute itself but because if effect be given to the literal sense of the language of the statute, it will be in conflict with and defeat the manifest intention of the Legislature in adopting the Act, and as derived from a reading of the law in its entirety. They insist further that it is the intention of the Legislature in enacting the statute which must be given effect, and that from a reading and consideration of the entire Act it was manifestly the Legislature's intention to allocate for aviation purposes all of the gasoline tax from gasoline *used* for aviation purposes within the State of Tennessee, and particularly that gasoline which was distributed through or at qualified airports and used for aviation purposes, irrespective of whether or not any *technical sale* took place at such airports."

The Chancellor, in a very careful and able opinion, found that there was no ambiguity in the literal

language of the Bureau of Aeronautics law but he examined the statute to determine whether or not the literal language is in conflict with the real intention of the Legislature, in accordance with the rule as stated in *Memphis Street Ry. Co. v. Byrne,* 119 Tenn. 278, 322, 104 S.W.2d 460, because if the literal wording of the Act be in conflict with the intention and purpose of the Legislature in enacting the law as the same appears from the Act itself, the Court under well-settled rules, is authorized to modify by addition, deletion or substitution, the wording of the Act to make it conform to the purpose and intent of the Legislature. *State v. Clarksville & R. Turnpike Co.,* 34 Tenn. 88; *Tennessee Title Co. v. First Federal Savings & Loan Ass'n.,* 185 Tenn. 145, 203 S.W. 2d 697.

The Chancellor then examined in detail the provisions of the Bureau of Aeronautics law, supra, for the purpose of determining whether, as insisted by appellants, the word "sold" as used in said section 15 of the 1950 Code Supplement as 2726.48 was intended by the Legislature to include not only the gasoline that was *sold* but also that which was used and/or distributed.

It was insisted before the Chancellor, as it is now under assignments of error 1, 2, 3, 7 and 8 of City of Nashville, that an examination of the various sections of the Bureau of Aeronautics law, supra, disclosed a purpose of promoting and regulating the aviation industry in the State, which was at that time in its infancy, and that when the Act is viewed as a whole it manifests an intention on the part of the Legislature that all State revenues arising from taxation of any kind of aviation facilities, operations, or businesses are to be allocated to the Bureau of Aeronautics and used for the sole purpose

of advancing the aviation program in this State; and that, therefore, the word "sold" as used in Code, sec. 2726.48, supra, should be enlarged to include also the tax on such gasoline as was used or distributed at such airports.

■ The Chancellor, although he readily found the purpose of the Bureau of Aeronautics law to be to aid and regulate the development of aviation in the State, nevertheless, held that the Act failed to disclose a clear and manifest intent of the Legislature to allocate any more of the gasoline tax funds to those purposes than that portion of them derived from the *sale* of gasoline for aviation purposes within the State. In this we think he was correct. The State gasoline privilege tax, Code, sec. 1126 et seq., had been in effect for a number of years before the enactment of either the county aid law or the Bureau of Aeronautics law. The county aid law, which was enacted in 1931, encompassed the three privileges, to-wit: selling, distribution and storage, as the same appeared in the State Gasoline Tax statute. Then in 1937, when the Aeronautics law was enacted, the Legislature would necessarily be presumed to be familiar with the three above mentioned privileges. Yet it provided for a tax only on such fuel as was *sold* for aviation purposes exclusively at every airport. Thus the Legislature has deliberately differentiated "sold" from the other words above. The meaning of "sold" is well understood, and its use in the statute does not render the statute absurd, quixotic or ambiguous.

■■ These statutes are in *pari materia* because they relate to the disposition of the proceeds of the gasoline privilege tax and hence should be construed in harmony

with one another. *Davis v. Beeler,* 185 Tenn. 638, 207 S.W.2d 343. The obvious purpose of the Aeronautics statute is to except from the total amount of the gasoline privilege tax collected an amount equal to seven cents for each gallon on motor fuel sold, for aviation purposes exclusively, at every airport or landing field licensed under the provisions of this article or operated by and under the authority of any governmental subdivision of this State. Any part of the gasoline tax that does not come within this definition is not covered by the Act, but is distributed elsewhere as provided by the other statutes.

█ Thus the language of the first paragraph of said section 2726.48 is clear; it means that the tax referred to is on motor fuel which is (1) sold, (2) for aviation purposes exclusively, (3) at every airport or landing field in this State, which is either licensed under the provisions of this article or operated under the authority of any governmental subdivision of the State.

█ If the transaction does not come within the above definition, then the rest of section 2726.48 has no application. Therefore, under all of the authorities there is nothing for the Court to do except to take the language of the Act as it is written by the Legislature. *Miller v. Childress* 21 Tenn. 320; *Atlantic Coastline Railroad Co. v. Richardson,* 121 Tenn. 448, 459, 117 S.W. 496; *Hickman v. Wright,* 141 Tenn. 412, 418, 210 S.W. 447; *Nashville Electric Service v. Luna,* 185 Tenn. 175, 204 S.W.2d 529; *Phillips & Buttorff Mfg. Co. v. Carson* 188 Tenn. 132, 217 S.W.2d 1.

It is insisted that the language of the second paragraph of said section is ambiguous in that it uses the

expression "taxes collected from each of the airports," because it is said that no taxes were collected from any airport. That, however, is a matter which could only require construction after it has first been determined that the transaction comes within the meaning of the first paragraph. But if there could be any question about the meaning of the word "sold" as used in the first paragraph, a reference to the third paragraph would make it abundantly clear that the Legislature had reference only to a sale because the word "sale" is used and the word "sold" is repeated.

The fourth assignment complains of the holding that no administrative construction of the Act has been established.

The fifth assignment complains that the Chancellor erred in failing to hold that the administrative construction of this Act is entitled to great weight. The Chancellor held that there was no evidence in the stipulation to show what construction the Department of Finance and Taxation put on the Act. Whether or not he was correct in this we do not deem it necessary to determine, for the reason that it is only where the words in the statute are ambiguous or doubtful that the Court will be inclined to attach great weight to an administrative construction of long standing.

*National Life & Accident Insurance Co. v. Dempster,* 168 Tenn. 446, 79 S.W.2d 564; *Sanford Realty Co. v. City of Knoxville,* 172 Tenn. 125, 110 S.W.2d 325.

Since we have held above that this Act applies only to sales, the rule of administrative construction has no application.

Our views above expressed make it unnecessary to discuss assignment six.

The assignments of error of City of Memphis, except No. 5, present the same questions as Nashville. No. 5 insists on estoppel by laches of the counties in not objecting to the administrative interpretation and distribution.

■ The Chancellor correctly disposed of this contention as follows:

"No stipulation is made as to whether any of the counties knew or agreed to the basis of allocation as set forth herein."

All assignments are overruled and the decree of the Chancellor is affirmed; the cause is remanded for further proceedings appropriate to this decree.