CITY OF NASHVILLE

*v.*

STATE BOARD OF EQUALIZATION et al.

360 S.W.2d 458.

(*Nashville,* December Term, 1961.)

Opinion filed September 7, 1962.

Petition for Rehearing denied October 4, 1962.

ROBERT H. JENNINGS, JR., City Attorney, FRANK S. KING, JR., Special Counsel, Nashville, for plaintiff.

GEORGE F. McCANLESS, Attorney General, MILTON P. RICE, DAVID M. PACK, Assistant Attorneys General, Nashville, for State Board of Equalization.

REBER BOULT, EDWIN F. HUNT and VAL SANFORD, Nashville, for Baptist Sunday School Board.

MR. JUSTICE FELTS delivered the opinion of the Court.

The Sunday School Board (the Board) of the Southern Baptist Convention owns a large amount of real estate in the City of Nashville. The City assessed this real estate for *ad valorem* taxation under Tennessee Code Annotated (T.C.A.) sec. 67-501, which requires that "all property," except such as is declared to be exempt, "shall be assessed for taxation for state, county and municipal purposes."

The Board protested the assessments and claims its properties are exempt from taxation under T.C.A. sec. 67-502(2) (quoted pp. 14, 16, infra), which exempts the real estate of a "religious, charitable, scientific or educational institution," when occupied and used by such institution "exclusively for carrying out thereupon one (1) or more of the purposes" for which it "was created"; but any part of its property not so exclusively used for such purpose shall be taxed to the extent of its value.

The Board's claim of exemption was upheld by the State Board of Equalization. Asserting this holding was illegal and in excess of the State Board's jurisdiction, the City filed a petition for certiorari in the Chancery Court. That Court dismissed the petition and sustained the State Board's holding. The Court of Appeals affirmed the Chancellor's decree. Because of the importance of the question involved, we granted certiorari and the case has been heard here.

There is no dispute as to the facts, the only evidence being that adduced by the Board. The Board is a "religious institution". It was organized in 1921 as a nonprofit, general welfare corporation under the laws of Tennessee. Its corporate name is "The Sunday School Board of the Southern Baptist Convention". The purposes for which it was created and exists, as stated in its charter, are:

"the establishment, support, and maintenance of any Sunday School undertaking on the part of said Southern Baptist Convention, and to print or purchase and disseminate, by gift or sale, religious literature for the purpose of the propagation of the Gospel and the advancement and spread of the religious faith which said

Southern Baptist Convention is engaged in advancing or promulgating."

The Board's headquarters or situs is in Nashville. It operates a publishing house and a bookstore here and bookstores elsewhere. Its principal activities are the publication and sale of religious materials or literature and books to the members of the churches and to the churches in the Southern Baptist Convention throughout the South; and it also carries on service programs for church conventions and for the training of people for the work of the Baptist churches.

From its operations the Board receives a gross income of nearly $2,000,000.00 per month, it employs some 900 employes, and its net assets on July 31, 1960, were $28,-703,920.00. Among its "fixed assets" listed are: "Land and land improvements $2,318,908" and "Buildings and improvements $14,871,021" (balance sheet, Ex. 2, Dr. Sullivan). The Board owns 16 parcels of real estate in the City of Nashville.

The City in 1960 assessed this real estate for taxation at a total assessment of $5,083,600.00. Four of these parcels, assessed at a total of $287,400.00, were not occupied by the Board but were leased by it to other persons for purposes of their own businesses, such as a parking lot, filling station, etc. It is conceded that these parcels are not exempt but are to be taxed *ad valorem* for state, county, and city purposes.

As to all of the other parcels, assessed at a total of $4,796,200.00, the Board protested these assessments and claimed these properties are exempt. It appears that upon the hearing before the State Board, the City con-

ceded that these properties were being occupied and so used by the Board as to be exempt, except certain parts of them which were being used by the Board for the purposes of operating a restaurant or cafeteria, a snack bar, and parking lots for parking or storing automobiles.

Upon one of these parcels the Board has a large building, its "Administration Building". Part of this building is used by the Board for the restaurant or cafeteria for its employes. The floor space of the part so used is 2610 square feet, that of the whole building being 133,336 square feet. The City had assessed this building as a whole at $1,116,300.00, but conceding all of it to be exempt except this 2610 square feet, the City asked the State Board to value it at $21,800.00.

Upon another of these parcels the Board has another large building, its "Operations Building." It uses part of this building for the operation of a snack bar—a place with machines which dispense hot soups, coffee, eat-a-snacks, etc., upon deposit of coins. The total area of this building (not counting its roof used for parking automobiles) is 321,650 square feet, and that of the part used for the snack bar is 4176 square feet. The City asked the State Board to value this part at $28,000.00.

The Board owns five other parcels which it uses as parking lots for automobiles of its employees. The total area of these five lots is 128,000 square feet and accommodates some 300 automobiles. The Board also uses the roof of its Operations Building for parking of automobiles of its employees, this space accommodating 365 automobiles. It issues parking permits to its employees, and has an employee at each lot to supervise the parking and to keep other persons from parking there.

Before the State Board, the City contended that these parts of the Board's properties, used by it for the parking lots, restaurant, and snack bar, were not being used for any of its charter purposes, but for other and different purposes, and so were not exempt, but should be separately taxed to the extent of their value, which the City asked the Board to fix at $704,000.00.

The State Board held that these parts of the properties so used for other purposes (parking lots, cafeteria, and snack bar) were exempt from taxation: that they were being used "*either* purely and exclusively for religious purposes *or for purposes so close thereto* as to come within the exemption provided by the statute" (italics ours).

The Chancellor concluded that "the operation of these units" were "fringe benefits for the employees," which tended to promote the efficient operation of the Board, resting his conclusion upon these facts found by him:

"The Court takes judicial knowledge that many big concerns provide nonprofit cafeterias for convenience of their employees. The 'coffee break at the snack bar' is also a well established fact in business.

"The furnishing of parking space, cafeterias and snack bars are in a sense 'fringe benefits' for the employees, all of which makes for more satisfied, efficient, and permanent employees."

The Court of Appeals took the same view. It held our present exemption Act (ch. 47, 1935, now T.C.A. sec. 67-502(2)) made no change in the pre-existing acts (of 1883, 1889, 1899, 1907), but its "relevant language was substantially the same" as those acts, and its interpreta-

tion was controlled by our cases interpreting those former acts, giving them a liberal construction in favor of the exemption.

And so construing this Act, the Court held that even though these parts of the Board's properties were being used for the other purposes stated, they were nonetheless to be regarded as being used exclusively for religious purposes, and exempt from taxation, because their use for such other purposes was incidental to their primary use for religious purposes (citing *State ex rel. v. Waggoner,* 162 Tenn. 172, 35 S.W.2d 389).

This holding was erroneous, the City insists. It argues that this act displaced the former acts, narrowed the scope of tax exemption, and the cases construing those acts are not relevant in interpreting this act; that the Board's use of its properties for the other purposes stated (parking lots, restaurant, and snack bar) is a use not for a religious purpose, but for business purposes, and its claim of exemption for the properties so used can not be maintained under this act.

In debating these questions, learned counsel have discussed this act, together with its constitutional background, the former acts and our cases under them, the public policy of the State, and the relevant rules of statutory construction. So, a consideration of these matters seems appropriate to an understanding and decision of the questions in this case.

It is a fundamental rule that all property shall be taxed and bear its just share of the cost of government, and no property shall escape this common burden, unless it has been duly exempted by organic or statute law; and that one claiming such exemption has the burden of show-

ing his right to it. 2 Cooley on Taxation (4th Ed.) sec. 672; 51 Am.Jur., Taxation, sec. 524; *American Bemberg Corp. v. Elizabethton,* 180 Tenn. 373, 378, 175 S.W.2d 535; *American Nat. B. & T. Co. of Chatta. v. McFarland,* 209 Tenn. 263, 352 S.W.2d 441, 443, 444.

"Taxes are the life blood of civil government. The right of taxation is an attribute of sovereignty. It is inherent in the state, and essential to the perpetuity of its institutions; consequently he who claims exemption must justify his claim by the clearest grant of organic or statute law." *Knoxville & O. R. Co. v. Harris,* 99 Tenn. 684, 693, 43 S.W. 115, 53 L.R.A. 921.

"It is the policy of the state, and but justice between its citizens, that all property shall be taxed, and that no property shall escape this common burden, unless it comes fairly within the exemption; and it is incumbent on the plaintiff [claiming exemption for its property] to show that it comes within the exempting clauses of the constitution and statute." (*M. E. Church, South v. Hinton* (1892), 92 Tenn. 188, 21 S.W. 321, 19 L.R.A. 289). *State ex rel v. Waggoner,* 162 Tenn. 172, 176, 35 S.W.2d 389.

■ Our Constitution (1870) provides (Art. 2, sec. 28[1]) that "*all* property" shall be taxed, but "the Legislature may except" such as may be held by the State, etc., and "such as may be held *and used for purposes purely* religious, charitable, scientific, literary, or educational." (Italics ours) Thus, this provision of our Constitution

---

[1] Art. 2, Sec. 28: "All property real, personal or mixed shall be taxed, but the Legislature may except such as may be held by the State, by Counties, Cities or Towns, and used exclusively for public or corporation purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary or educational * * *."

does not grant any tax exemption, does not establish any public policy of exemption, but merely authorizes, permits, the Legislature to grant exemption in the cases specified.

In 1883 the Legislature (by Acts 1883, ch. 105) exempted "all property belonging to any religious, charitable, scientific, literary, or educational institution, and *actually used for the purposes* for which such institution was created." (Italics ours) Under that act arose the case of *State v. Fisk University* (1888), 87 Tenn. 233, 10 S.W. 284, cited and relied on by the Board and the court below.

That case involved not a religious, but an educational, institution. Fisk University had purchased land lying between its two main buildings with the idea of erecting other buildings on such land as soon as funds could be raised therefor. While the land was thus vacant, it was used by the University for the growing of vegetables and corn for use in the mess hall to feed students living in its dormitory on the campus.

The Court held that since the traditional idea of a university, as an educational institution, includes buildings where students are housed, fed and instructed, and since a mess hall or dining room is a customary and essential part of such institution, the use of this vacant land for the growing of vegetables to supply the mess room for these students, was a use for a purpose purely educational, and the land so used was exempt from taxation under this Act of 1883.

The Court emphasized that this was an educational institution, quoted that provision of our Constitution (Art.

11, sec. 12²) making it the duty of the General Assembly "to cherish literature and science", and pointed out that this provision, with our statutes respecting public schools, established education as a State policy; and the Court said that since this educational institution aided in carrying out that policy, the legislative intention of that act was to be interpreted "from the language used, and from the policy of the state with reference to such institutions."

The next case cited by the Board and by the court below is *M. E. Church, South v. Hinton* (1892), supra. It arose under the Act of 1889 (ch. 96), which exempted property owned by a religious, charitable, or educational institution and "used *exclusively* for the purpose for which said institution was created" (Italics ours).

That case involved not an educational institution (not a school or university) but an institution religious and charitable—religious, in that it was under the control of the Church; and charitable, in that its profits were to be used for a named class of beneficiaries (superannuated preachers, etc.). It was the "Book Agents of the M. E. Church, South," a corporation chartered by special act of the Legislature (1855) and put under control of the Church.

Its principal activity was that of a publishing house and bookstore of the Church. It also used its property in "secular business"—job printing, etc., in competition with other like business that paid taxes. A majority of

²"Knowledge, learning, and virtue, being essential to the preservation of republican institutions, and the diffusion of the opportunities and advantages of education throughout the different portions of the State, being highly conducive to the promotion of this end, it shall be the duty of the General Assembly in all future periods of this Government, to cherish literature and science."

the Court held that its property, though used for purposes of business, was still "used exclusively" for religious and charitable purposes, because the profits of the business were used for such purposes. It was there said:

"Even if we concede that the work done could not strictly be called religious, still the proceeds therefrom are wholly devoted to the charitable purposes contemplated in the creation of the institution, and the work done cannot be considered immoral, or at variance with the religious feature of the institution."

There was, however, a vigorous dissent by Justice Snodgrass, expressing the view, which has since been widely accepted, that the intent of the Constitution and of the act was to exempt only such of the institution's property as was physically occupied by it and used directly for its necessary purposes, and not property used for other purposes or business from which it derived a consequential benefit; that the exemption did not depend on how the profits from such business might be ultimately used; if so, he said:

"any business enterprise may be organized, and purporting to be an agency or auxiliary of a religious, literary, educational, scientific, or charitable institution, run, free from taxation, in competition with other like institutions; and so, finally, *all business* in the state might be run, as *competition by taxed enterprises would be driven out.*" (Italics ours) (92 Tenn. 205, 21 S. W. 325).

The next case involved an educational institution. It was *Vanderbilt University v. Cheney* (1905), 116 Tenn. 259, 94 S.W. 90. It arose under the Act of 1899 (ch. 435), which exempted the property of any religious, charitable,

or educational institution, "when used exclusively for the purpose for which said institution was created," with the proviso that all of such property used in "secular business" competing with a like business that pays taxes to the State, shall be taxed * * *."

There, the University owned an apartment house and an office building in uptown Nashville, which it rented out in competition with other like taxpaying property. It was held, however, that such renting of the property was not a use of it in "secular business competing with a like business that pays taxes to the State," but was for a charter purpose of the institution, since it used such rents and profits for that purpose.

It seems the basis of this holding, that the University's renting of its properties did not constitute a use of them in "secular business" competing with other like taxpaying property, was that the renting of property had not been declared a business and taxed as a privilege. The Court said: "It is conceded that *no privilege or tax is imposed upon private owners for merely renting out their property * * *.*" (Italics ours).

Our next revenue act was the Act of 1907 (ch. 602). It was a complete, comprehensive act covering the whole subject. Its section (2) contained a provision for tax exemption, which was expressed in the same language as that of the 1899 Act above referred to. This provision was likewise re-enacted without change as sub-section (2) of section 1085 of the Code of 1932.

The scope of exemption, as applied in the Cheney and Hinton cases, was somewhat narrowed in *Ward Seminary v. City Council* (1913), 129 Tenn. 412, 167 S.W. 113, which involved the 1907 Act. There, an educational institution, a

corporation organized for profit, not general welfare, owned several pieces of real estate, some used in carrying on the school and some not so used but rented to others for business purposes. It was held that the property used for the purpose of the school was exempt, but that which had been rented for business purposes was not exempt.

There, Chief Justice Green said that the Fisk, Hinton, and Cheney cases had held that certain income-bearing property, though "not actually used for religious, charitable or educational purposes," was exempt, upon the theory that the income had been used for such purposes; but that in those cases the property was owned by corporations not for profit but for general welfare; and that the rule applied to them would not be extended to a corporation for profit. He said:

"The doctrine of *Methodist Episcopal Church, South, v. Hinton,* and of other cases above cited, was announced by divided courts, and has been subjected to criticism. It certainly will not be extended. * * *" (129 Tenn. 421, 167 S.W. 115). For further criticism of the Hinton case, see Zollman American Law of Charities (1924) section 724.

The tax exemption was further narrowed in *State ex rel. v. Waggoner* (1931), 162 Tenn. 172, 35 S.W.2d 389. There, Ward-Belmont College owned a house, located just across the street from its campus, which it furnished "rent-free" as a residence to its vice-president and business manager. It claimed exemption for the house on the ground that it was being used primarily for an educational purpose and only incidentally as a home of the school's employee. The Court denied this claim.

The tax exemption under the Act of 1907 (1932 Code sec. 1085(2)) was again restricted in *State et al v. Rowan et al.* (1937), 171 Tenn. 612, 106 S.W.2d 861. There, the University Club, a non-profit general welfare corporation, claimed its property was exempt, because it was used primarily for the purpose of education and only incidentally for social and athletic activities. The Court, however (opinion by Chief Justice Green) denied this claim.

Thus, it is seen that the scope of tax exemption of property of such institutions has been steadily narrowed by decisions of this Court under our successive revenue acts, including the Act of 1907 (1932 Code sec. 1085(2)); and that Act was expressly repealed, and the exemption further restricted, by the Act of 1935 (ch. 47, now T.C.A. sec. 67-502(2)).

This change in the law was pointed out in *Baptist Memorial Hospital v. Couillens* (1940), 176 Tenn. 300, 140 S.W.2d 1088. There, the Court, in determining the extent of the immunity of a charitable institution's property from liability for its torts, said it should be the same as its exemption from taxation, and thus the Court was called on to consider the scope of such exemption. In this connection, the Court said:

"It is pertinent to observe that the public policy of this State in regard to tax exemption of such institutions has undergone a change, evidenced by Court constructions of our older statutes, and more emphatically, by recent legislative action."

And the Court referred to the cases of *State ex rel. v. Waggoner,* supra, and *State et al. v. Rowan et al.,* supra, as cases "in which further emphasis is put on the limitations upon exemptions under our laws. A tendency has

been shown to tighten, rather than expand, the scope of our tax exemptions.''

The Court further said that in 1935, ''obviously in response to a growing public sentiment against abuse of our exemptions of educational and charitable institutions, the Legislature enacted Chapter 47, Pub.Acts of 1935, *re-defining, limiting,* and *restricting* the exemption * * *'' (italics ours) (176 Tenn. 311, 140 S.W.2d 1092).

As above stated, our 1907 exemption act (1932 Code sec. 1085 (2)) was *expressly repealed* by the Act of 1935 (ch. 47, sec. 1, p. 131), by striking out its language and substituting *new* and *different* language. This 1935 Act still stands as our statute law, since it was re-enacted, without change, in 1950 Code Supp. (sec. 1085(2)) and again as T.C.A. sec. 67-502(2).

So, in view of the change in our public policy above noted, and in view of the fact that our former exemption acts have been displaced by the 1935 Act (T.C.A. sec. 67-502 (2)), *''redefining, limiting* and *restricting* the exemption,''* we think our earlier cases under those former acts do not control in interpreting this Act, but it is to be interpreted upon its own words, construed in the light of our public policy. The pertinent part of this Act is as follows:

''67-502. The property herein enumerated shall be exempt from taxation: * * *

''(2) The real estate owned by any religious, charitable, scientific or educational institution and occupied by such institution or its officers exclusively for carrying out thereupon one (1) or more of the purposes for which said institution was created or exists, and the

personal property of any such institution used exclusively for one (1) or more of the purposes for which such institution was created or exists.

"But the property of such institution shall not be exempt if the owner, or any stockholder, officer, member or employee of such institution shall receive or may be lawfully entitled to receive any pecuniary profit from the operation of that property in competition with like property owned by others which is not exempt, except reasonable compensation for services in effecting one (1) or more of such purposes, or as proper beneficiaries of its strictly religious, charitable, scientific or educational purposes; or if the organization thereof for any such avowed purpose be a guise or pretense for directly or indirectly making any other pecuniary profit for such institution, or for any of its members or employees, or if it be not in good faith organized or conducted exclusively for one (1) or more of said purposes. The real property of any such institution not so used exclusively for carrying out thereupon one (1) or more of such purposes, but leased or otherwise used for other purposes, whether the income received therefrom be used for one (1) or more of such purposes or not, shall not be exempt; but if a portion only of any lot or building of any such institution is used exclusively for carrying out thereupon one (1) or more of such purpose of such institution, then such lot or building shall be so exempt only to the extent of the value of the portion so used, and the remaining or other portion, to the extent of the value of such remaining or other portion, shall be subject to taxation" (italics ours).

—Thus, the first paragraph of subsection (2) above clearly restricts the exemption of such an institution's real estate to that *"occupied"* by it or its officers *"exclusively* for carrying out thereupon one (1) or more of the purposes for which said institution was created or exists.'' Its real estate not so occupied exclusively for such purpose is not exempt.

The second paragraph of subsection (2) above further spells out this restriction by specifying these four cases in which such property *shall not be exempt:*

(1) Where anyone receives, or may be entitled to receive, ''any pecuniary profit from the operations of that property in competition with like property owned by others which is not exempt'' (with the exceptions stated, not here material).

(2) Where the organization of such an institution ''for any such avowed purpose be a guise or pretense for directly or indirectly making any other pecuniary profit for such institution, or for any of its members or employees.''

(3) ''The real property of any such institution not so *used exclusively* for carrying out thereupon one (1) or more of such *purposes,* but leased or *otherwise used for other purposes,* whether the income received therefrom be used for one (1) or more of such purposes or not, *shall not be exempt''* (italics ours).

(4) ''If a *portion* only of any lot or building of any such institution is *used exclusively* for carrying out thereupon one (1) or more of such purposes of such institution, then such lot or building shall be so exempt only to the extent of the value of the portion

*so used,* and the *remaining* or other *portion,* to the extent of the value of such remaining or other portion, *shall be subject to taxation"* (italics ours).

Thus, from the plain meaning of this language, it is quite clear that this Act excepts and exempts real estate of such an institution from the common burden of taxation only if and when such real estate

(1) is *"occupied* by such institution or its officers *exclusively* for carrying out thereupon one (1) or more of the *purposes"* of its charter, and

(2) is being *"used exclusively"* for such purpose, and any part of such real estate "not so used *exclusively"* for such purpose, "but leased or *otherwise used for other purposes,"* shall be taxed to the extent of its value.

For the Board, however, it is urged that this Act made no change in the pre-existing law as to "property *occupied* by such institution," but only as to its property *"leased"* to others, or its investment property, which had been held exempt, not because such property had been used for an exempt purpose, but because its *income* had been; and that this Act took away the exemption of only that class of property.

To support this, the Board invokes the rule of *ejusdem generis,* which, in substance, is that wherein a statute special words limiting its scope are followed by general words, such general words will ordinarily be limited to things of the same class as that denoted by the special words. *State v. Grosvenor,* 149 Tenn. 158, 163, 258 S.W. 140; *City of Knoxville v. Brown,* 195 Tenn. 501, 508-510, 260 S.W.2d 264.

And it is argued that, under this rule, in the above phrase, "but leased or otherwise used for other purposes" ((3) supra), the general words "otherwise used for other purposes" should be limited to the class indicated by the special word "leased," and should be held to refer only to the institution's "leased" or investment property, and not to any of its property used otherwise than exclusively for one of its charter purposes.

■ The rule *ejusdem generis* is not a rule of law but merely a rule of construction to aid in reaching the intent of a statute that is doubtful or ambiguous. Where, as here, the Act is free from doubt or ambiguity and its intent clear, there is no room to resort to any auxiliary rule of construction. *State ex rel. Weldon v. Thomason,* 142 Tenn. 527, 539, 221 S.W. 491; *Gilmore v. Continental Casualty Co.,* 188 Tenn. 588, 591, 221 S.W.2d 814; *Hickman v. Wright,* 141 Tenn. 412, 418, 210 S.W. 447.

■ As said above, the plain intent of this Act is to exempt such an institution's real estate only when it is both (1) *"occupied"* and (2) *"used exclusively"* by the institution for *one of its charter purposes;* and the exemption is denied not only to property "leased" by it to others, but also to property occupied by it but "not used exclusively" for a charter purpose.

As above stated, the Board is a non-profit general welfare corporation organized for the purposes stated in its charter (p. 459, supra), which are the support of Sunday Schools in the Churches of the Southern Baptist Convention, the printing and sale of religious literature to them, and the spread of their religious faith; that is, the Board is a religious institution and its charter purposes are religious purposes.

We think, however, it can hardly be said that the Board's use of these parts of its real estate, as above described, for the operation of its parking lots, cafeteria, and snack bar, is a use "for purposes *purely religious,*" as contemplated in our Constitution (Art. 2, sec. 28), or a use *"exclusively"* for a *religious purpose* of its charter, as contemplated by the Act of 1935.

It is emphasized by the Board that its operation of the parking lots, restaurant, and snack bar, is for its employees only, not for profit, and not commercial. Nevertheless, such operations are not religious activities, but are secular business enterprises, carried on in competition with other like businesses that pay taxes to the state, the county, and the city; and such businesses are taxed as a privilege.

Our statute (T.C.A. sec. 67-4203) imposes a privilege tax upon the operation of such a restaurant or cafeteria as that here operated by the Board, and measures the amount of the tax by the number of seats, based on a population classification of the county in which the business is run. The part of the statute here pertinent is as follows:

"General welfare corporations, operating restaurants, cafeterias, etc., for members only, and persons operating restaurants, cafeterias, etc., for their employees only and not for profit, shall pay a tax for each seat provided by chair, stool, bench and otherwise, of twenty-five cents (25¢) per seat" (67-4203, Item 92).

Likewise, the operation of parking lots or places for parking or storing of automobiles is not a religious undertaking, but a secular business taxed as a privilege by the state, the county, and the city (T.C.A. secs. 67-4201,

67-4202, 67-4203, Item 8(j)). The pertinent parts of Item 8(j) are as follows:

"(j) AUTOMOBILE STORAGE GARAGES OR LOTS.—Each person operating or conducting a garage, parking lot or other place of business for the purpose of storing or parking automobiles shall pay a privilege tax as follows: (here follows schedule).

\* \* \* \* \*

"Provided, however, that where the places of business for the purpose of storing or parking automobiles are conducted on open-air lots and not in buildings or garages, the tax shall be only two-thirds (2/3) of the above amounts as classified by population" (T.C.A. Supp. sec. 67-4203, Item 8(j)).

So, its seems clear that the parts of the Board's real estate used by it for purposes of these businesses, in competition with other like tax-paying businesses, cannot, under the plain terms of this Act, be said to be "used *exclusively*" for a religious purpose as authorized by its charter (Cf. *State ex rel. v. Southern Pub. Ass'n,* 169 Tenn. 257, 84 S.W.2d 580, 100 A.L.R. 576), and are not exempt, but should bear their just share of the common burden of taxation.

For the Board, it is argued that its operation of these facilities (parking lots, etc.), for its employees makes them more efficient and thus promotes the efficiency of the Board's operation in its religious work; and that these parts of its property, though used for such other purposes, should, nevertheless, be held to be "used *exclusively*" for religious purposes, because their use for the other purposes is only incidental to their primary use for religious purposes.

This argument proceeds upon the premise that a religious institution's property may be used for two purposes, one business and the other religious; that because the business operation results in benefits to the religious purpose, the former is to be called incidental, and the latter primary, for the purpose of bringing the whole operation of the property within our exemption from taxation.

This contention overlooks the terms of our act and the change of our public policy of tax exemption, above noted, and goes back for its support to our earlier cases of *State v. Fisk University* (1888), supra; and *State ex rel. v. Waggoner* (1931), supra, and like cases. But we think even those cases do not support the Board's contention in this case.

As we have seen, the use of the property in the Fisk case was a use for a purpose (supplying the mess hall) which was a traditional and an integral part of the carrying on of such an educational institution, and not, as here, a use for a secular business purpose outside the purposes stated in the Board's charter and in competition with other like businesses that pay taxes.

In the Waggoner case, as we have seen, the college owned a house near its campus which it furnished rent-free as a residence to its vice-president and general manager, and claimed exemption for the house upon the ground that it was being used primarily for an educational purpose and only incidentally as a home for its employee. The Court denied this claim of exemption.

There, the Court stated that counsel agreed that the school's property might "be regarded as used exclusively for educational purposes" if its primary use was

for such purpose, even though its incidental use was for another purpose; that such had been the holding in cases where teachers or other employees had occupied houses of schools; that such cases could not easily be reconciled; and that such a judgment as to the use of property was *"necessarily relative"* (italics ours).

And, as said above, those cases under former acts are not controlling under this Act. We think that this Act does not recognize such a two-purpose use of a religious institution's property; that it exempts only property "occupied" and "used *exclusively*" by the institution for a purpose within its charter—*"property physically used in the work of the institution"* (italics ours ) [3]; and that the Act refers to the *direct* and *immediate* use of the *property itself* and not to any *indirect* and *consequential benefit to be derived from its use.* See Zollmann, American Law of Charities (1924), 488.

It may well be that the Board, like many other large business concerns, finds that its furnishing eating and parking facilities for employees makes them better satisfied and furthers its efficiency. The same would no doubt be true as to furnishing them many other "fringe benefits" of modern-day living; and if the Board may operate the parking lot and restaurant businesses tax-free, why may it not also operate other businesses tax-free, such as housing project, clothing store, automobile repair shop, etc., for its employees?

---

[3] Chief Justice Green said "that, under the Act of 1935, only such property of religious, charitable, scientific or educational institutions as is exclusively used for carrying out one or more of the purposes of that institution is exempt from taxation. In short, the property physically used in the work of the institution is exempt." *State ex rel. Beeler v. City of Nashville* (1942), 178 Tenn. 344, 349, 157 S.W.2d 839, 841.

■ To sustain the Board's contention in this case, to hold that it may use its real estate for purposes of secular business enterprises, outside the purposes stated in its charter, with no relation to such purposes except the consequential benefits to be derived from such operation, would be in our opinion, to disregard our Act and our public policy of exemption.

Moreover it would open the way for religious institutions to acquire real estate tax-free and run thereon business enterprises tax-free, in competition with other like tax-paying businesses, and would bring about the problems and the dangers envisioned 70 years ago by Justice Snodgrass (*M. E. Church S. v. Hinton,* supra, p. 463.)

■ It is a matter of current history, which the Court judicially knows, that during the last quarter of a century, the tax burdens of the individual taxpayer have grown increasingly heavier. The care and support of the poor and needy, formerly the work of charities, has been largely taken over by government, federal, state and municipal, and is carried on by means of public taxation; and our cities, with their tax sources largely pre-empted by the federal government, are constantly struggling to find new sources of revenue to meet the growing needs for police and fire protection, schools, and social welfare.

The policy of tax exemption of religious institutions, established when they were struggling to get along, has enabled them, during the last quarter of a century, to acquire large real estate holdings and to accumulate great wealth; and many of them are engaged in operating various kinds of secular businesses tax-free, in competi-

tion with other like businesses that are taxed. This development creates inequities and endangers both the churches and the state.

This danger is recognized by many thoughtful leaders of the churches. For example, Dr. Eugene Carson Blake, former President of the National Council of Churches, and leader of the ecumenical movement, recently said: " 'In view of their favored tax positions, with reasonably prudent management America's churches ought to be able to control the whole economy of the nation within the predictable future' (CHRISTIANITY TODAY, Aug. 3, 1959, issue)."[4]

That writer (Mr. Armstrong) asks whether, since the income from church-operated businesses is used for religious purposes, this is a reason for tax exemption; and in reply says: "Most church leaders say no. They are concerned by the frequent charge that tax exemptions are poorly-concealed forms of tax support for organized religion" (CHRISTIANITY TODAY (Oct. 13, 1961), p. 22).[5]

For many thoughtful churchmen, the question of tax exemption of church-operated businesses raises a question of moral principle. Says Dr. Blake, "We must

---

[4] Quoted by O. K. Armstrong, prominent Baptist layman and former member of Congress, in "Tax Churches on Business Profits?", CHRISTIANITY TODAY (Oct. 13, 1961), pp. 19-23, condensed under title "Should Churches Be Exempt From Business Taxes?", READERS DIGEST (Nov. 1961), pp. 111-115. This article states that churches and church-related agencies have accumulated large real estate holdings, and operate tax-free businesses of various kinds in many of our cities.

[5] Our state Constitution (Art. 1, sec. 3) guarantees freedom of worship and separation of church and state, and provides that "no *preference* shall ever be given, by law, to any religious establishment or mode of worship" (italics ours).

seriously ask ourselves whether Christianity's lofty goals are not severely compromised by our tax exemptions." [6]

Referring to the privileged position of the churches by reason of tax exemption of their business operations, and to the fact that such exemption creates inequities which endanger the future of the churches of our nation, Dr. Blake says:

"It is obvious to any taxpayer that too much tax-exempt property creates serious problems for governments beset by a population explosion. Cities are struggling to find new sources of revenue to meet the growing needs for police and fire protection, schools, and social welfare.

"Since the biggest exemptions go to schools and government properties it is clear that eliminating all religious exemptions would not ,solve the revenue problem. Nevertheless, if churches continue to accumulate land and business, the problem could become explosive, Revolutionary expropriation of church properties was the solution resorted to in 16th-century England, 18th-century France, 19th-century Italy, and 20th-century Russia. Mexico still suffers social convulsions from such a seizure.

"Hard-pressed governments sooner or later will turn on wealthy churches, and a wave of anticlericalism and atheism always precedes the clash. Such feeling already is apparent in the U.S. It has not yet reached the dangerous stage, but it is growing steadily" (TOGETHER, supra, p. 29).

---

[6] Quoted from Dr. Blake, "Should Church Property Be Taxed," TOGETHER (April 1962), pp. 28-30, published by the Methodist Publishing House, Nashville, Tennessee.

Such considerations as these, we think, serve to re-inforce our change of public policy, as above noted, and our act limiting tax exemptions of such institution's property to that "occupied" and "used *exclusively*" by it for a purpose within its charter—"property physically used in the work of the institution," and not property used for a business purpose outside its charter.

The Board relies upon *Sunday School Board v. Evans,* 192 Tenn. 495, 241 S.W.2d 543, as supporting its claim that these parts of its real estate used by it in the business of operating parking lots, restaurant and snack bar, should be held exempt from taxation under our 1935 Act.

That case is not in point. It is true it was a claim of tax exemption by this same claimant—not, however, under this 1935 Act, but a claim of exemption under another and different act—our Sales and Use Tax Act (Acts 1949, Ch. 110, T.C.A. sec. 67-3014), exempting religious, educational, and charitable institutions from the sales or use tax on tangible personal property sold to them. So, that case affords no support to the Board's claim here.

■ The argument is made that the tax assessors over a long period have not assessed the properties of the Board, or of other like institutions, for taxation under this 1935 Act; and that this administrative construction of the officers charged with the enforcement of the Act is entitled to great consideration in ascertaining its legislative intent.

This rule as to the administrative construction of a statute applies only where the statute is doubtful or ambiguous. *Price-Bass Co. v. McCabe,* 161 Tenn. 67, 29 S.W.2d 249; *City of Nashville v. Gibson County,* 201

Tenn. 216, 227, 298 S.W.2d 540. It has no application to this Act which, as we have seen (supra, pp. 465, 466), is free from doubt or ambiguity, and its intent clear, without resort to any auxiliary rule of construction.

Learned counsel for the Board cite a number of cases from other states, but they frankly concede that such cases involved statutes different from ours and are of limited value in interpreting and applying our Act. Upon full consideration of those cases, we think none of them is applicable to this case, and that they do not require further discussion.

For these reasons, we think the decrees below were erroneous, and a decree will be entered here reversing them, sustaining the City's right to assess the parts of the Board's real estate used for business purposes, as above described, and remanding the case to the Chancery Court for further proceedings not inconsistent with this opinion. The costs of the cause are adjudged against Respondent Board.

BURNETT, WHITE and DYER, JUSTICES, concur.

PREWITT, CHIEF JUSTICE, dissents.

PREWITT, CHIEF JUSTICE, (dissenting).

I respectfully dissent from the majority opinion for for the following reasons:

The Chancellor held the properties in question to be exempt under our statutes and the Court of Appeals affirmed the action of the Chancellor.

There is no controversy as to the use to which the subject real estate is applied.

616

Under Article 2, Section 28, of our Constitution it provides that all properties real, personal or mixed shall be taxed, but that the Legislature may except such as is held by States, Counties or Cities, and used exclusively for public purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary or educational.

Section 67-502 T.C.A., entitled "Exemption Generally" provides that the property therein enumerated shall be exempt from taxation. Sub-section (2) of the Code provides that the real estate owned by any religious, charitable, scientific or educational institution and occupied by such institution or its officers exclusively for carrying out thereon one or more purposes for which said institution was created or exists, shall be exempt.

The section further provides that any other real estate, or property not used for such purposes, shall not be exempt.

Now it appears that the Sunday School Board owns certain other real estate that is taxable of which no question is made.

It is conceded by the City that the Administrative Building and the Operations Building are exempt from taxation. It appears that in the basement of the Administrative Building there is operated by the Board a cafeteria for employees, which is not a commercial operation, and this cafeteria is operated at a loss.

Another building operated by the Board is known as the Operations Building in which said Board maintains a snack bar, which has automatic machines to disepnse cold drinks.

The Board also owns and maintains certain parcels of land as parking areas for employees. These are not commercial parking lots and no portion of them is leased to any outsider, and no income is received.

Under the foregoing statement I think that the State Board of Equalization, the Chancellor, and the Court of Appeals were unquestionably right in holding that under the above stated statutes the property is exempt, that is the cafeteria for employees, the automatic machines to dispense cold drinks and the certain parcels of land as parking areas for employees, all are simply incidental to the real estate and are exempt from taxation under our statutes.

In this connection see *Sunday School Board of the Southern Baptist Convention v. Evans,* 192 Tenn. 495, 241 S.W.2d 543; *M. E. Church South v. Hinton,* 92 Tenn. 188, 21 S.W. 321; *State v. Fisk University,* 87 Tenn. 233, 10 S.W. 284; *State ex rel. Davidson County v. Waggoner,* 162 Tenn. 172, 35 S.W. 2d 389; *Baptist Memorial Hospital v. Couillens,* 176 Tenn. 300, 140 S.W.2d 1088.

For the foregoing reasons, I think the properties above enumerated are exempt from taxation and I would affirm the decree of the Court of Appeals.

ON PETITION TO REHEAR

FELTS, JUSTICE.

The Sunday School Board has filed an able and earnest petition to rehear, asserting that this Court erred in substituting its judgment for that of the State Board of Equalization ''on a question of fact'' in this case; and that we erred in holding that the terms of the 1935

Act (T.C.A. sec. 67-502 (2)) are clear and unambiguous, erred in our construction of it, and erred in holding that the Board's operations of its parking lots, restaurant and snack bar, were not religious activities, but secular business enterprises; and that the parts of its property used for such purposes are not exempt under that Act.

The record shows we did not substitute our judgment for that of the State Board *on a question of fact.* As pointed out in our opinion (page 459), there was no dispute or question of fact, the only evidence being that offered by the Board. The circumstances as to the purposes for which the properties were used being admitted, it was purely a question of law whether such purposes came within the exemption of the statute.

In support of the petition, learned counsel make an able, forceful and lengthy argument; but it is only a re-argument of matters already thoroughly argued by counsel and fully considered by us in reaching our conclusion. It points out no new matter of fact or law overlooked, but only re-argues things which counsel insist were improperly decided after full consideration.

"A petition for rehearing should never be used merely for the purposes of re-arguing the case on points already considered and determined, unless some new and decisive authority has been discovered, which was overlooked by the court. The office of a petition to rehear is to call the attention of the court to matters overlooked, not to those things which counsel supposes were improperly decided after full consideration" (*Louisville & N. Railroad v. Fidelity & Guaranty Co.,* 125 Tenn. 658, 691-693, 148 S.W. 671, 680). *Gulf, M. & O. R. Co. v Underwood,* 182 Tenn. 467, 476, 187 S.W.2d 777; *Memphis St. Ry. Co.*

*v. Cooper,* 203 Tenn. 425, 437-439, 313 S.W.2d 444; *Oliver v. State,* 208 Tenn. 692, 698, 348 S.W.2d 325; Rule 32, 209 Tenn. 806, 807.

" 'If re-hearings are to be had, until the counsel on both sides are entirely satisfied, we fear that suits would become immortal, and the decision be postponed indefinitely.' Story's Eq. Pl., 8th Ed., sec. 421, page 395, note. Compare *Andrews v. Crenshaw,* 51 Tenn. 151, 153." *Gulf, M. & O. R. Co. v. Underwood,* supra, 182 Tenn. 476, 187 S.W.2d 777; *Louisville & N. Railroad v. Fidelity & Guaranty Co.,* supra, 125 Tenn. 692-693, 148 S.W. 671.

The petition to rehear is denied at petitioner's cost.