**CHRISTIAN HOME FOR THE AGED, INC., d/b/a Appalachian Christian Village, Plaintiff-Appellant,**

v.

**TENNESSEE ASSESSMENT APPEALS COMMISSION and State Board of Equalization, Defendants-Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Feb. 9, 1990.

Permission to Appeal Denied by Supreme Court May 7, 1990.

R. Louis Crossley, Jr., Walt, Dyer and James, Knoxville, for plaintiff-appellant.

Charles W. Burson, Atty. Gen. & Reporter, Steven E. Winn, Asst. Atty. Gen., Nashville, for defendants-appellees.

## OPINION

CANTRELL, Judge.

This is an appeal from a judgment of the Chancery Court of Davidson County which upheld a decision of the Tennessee Assessment Appeals Commission denying the tax exemption of the plaintiff's property except for its chapel which is used for religious purposes and its nursing facility which is a licensed provider of health care.

### Facts

The findings of fact made by the commission are uncontroverted and were adopted by the trial court and are hereinafter restated in pertinent part.

The plaintiff, Christian Home for the Aged, Inc., d/b/a Appalachian Christian Village, is a retirement community in Johnson City, Tennessee. It opened in 1966 under the sponsorship of a group of the Christian Churches and Churches of Christ. It is a nonprofit Tennessee corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code. The corporation is governed by a board of directors whose members are elected by the churches that make financial contributions to the Village. Donations totaled $178,700.00 in 1985 when the total income was $2,637,658.36, excluding entrance fees and donations. Donations in 1987 were three percent of the total income.

All residents must be 62 years of age or over. The Village provides three types of living arrangements depending upon the mental and physical conditions of the resident. Those capable of independent living reside in either the towers, townhouses, or cottages. Persons requiring some assistance in housekeeping, cooking or other necessary daily activities live in the efficiency apartments. And those persons who need nursing care reside in the nursing home.

The towers is a high-rise apartment building containing self-sufficient two bedroom apartments of 1400 square feet. The Village furnishes appliances while the resident provides the furniture and pays for all utilities except water. Each apartment contains a living area, two bathrooms and a kitchen in addition to the two bedrooms. In addition, each apartment in the towers has an intercom system which can be activated in an emergency to call nursing personnel to the apartment. Public areas in the towers include a lobby, a library, a social room containing card tables, a sun room, and a game room.

The two bedroom apartments in the townhouses and cottages are similar to those in the towers, though they vary in size from 800 to 1200 square feet and they do not have an intercom system such as those of the towers.

Residents of the efficiency apartments located in the pentagonal shaped building generally need assistance in daily living. Efficiency apartments contain 350 to 450 square feet. These apartments are one room with the exception of 27 double apartments in which couples live. The apartments have small kitchenettes, but the Village provides three meals a day for these residents in the cafeteria located in the building. The Village also provides weekly cleaning for each apartment and weekly changes of bed linens. The residents are expected to do their own personal laundry and three coin-operated washers and dryers are available in the central area of the building.

The construction of the efficiency apartments was financed with a loan from the United States Department of Housing and Urban Development (HUD) under Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q. There is an outstanding balance

on the HUD loan. Gary L. Phillips, who oversees the daily affairs of the Village testified that in spite of the fact that the efficiency apartments were constructed with Section 202 funds, to his knowledge, there are no income limitations on the residents of the apartments and no federal subsidization of the tenants' rents.

Also located in a wing of the pentagonal building is the 101 bed state-licensed nursing home. Most of the rooms in this facility have two beds. Residents receive appropriate nursing care, meals and linens. The nursing wing was constructed primarily from donations; construction of the last twenty-five bed unit of the nursing wing was funded through $500,000.00 in donations.

Common areas in the pentagonal building that are available for use by any resident of the Village include the lobby/lounge area, the chapel, library, game room with pool and card tables, and social room. Each wing of the building also has a sun room and there are craft rooms and a sewing room in the wings of the building. In the hub of the building is the cafeteria, a small coin-operated laundry, a commercially operated barber/beauty shop, a gift shop operated by the residents of the Village and a pharmacy.

Although the Village does not employ a physician on its staff, it does provide an examination room in the nursing wing. This room may be used by any private physician to examine a patient who resides at the Village.

In determining whether to accept an applicant for residence in the Village, the board of directors of the Village considers the applicant's moral character, recommendation of the Christian Church or the Church of Christ, his or her physical condition and financial condition.

Residents of the towers, townhouses and cottages make a one time nonrefundable donation to the Village of $62,500 to $67,-500, which guarantees lifetime healthcare. As the resident's physical and mental health deteriorates, the resident may move to other units in the Village, without additional charge, except for meals. When the resident vacates a unit, the unit reverts to the Village to be resold.

The residents also pay monthly maintenance fees for townhouses and cottages of $60.00 and $80.00 for the towers. They also pay their pro rata share of the real property taxes.

Residents of the efficiency apartments are not requested to make the "one-time donation", but they pay rent of $485 to $780 per month. If applicable, there is a nursing facility fee of $37.00 per day plus the costs of meals and drugs.

Officials of the Village do not recall refusing an applicant for residence due to inability to pay the fees, yet the ability to pay is a factor in the evaluation of an application. The only example given of subsidization was the recent sale of a cottage for $55,000 when the Village would have asked $65,000 if the applicant could have afforded that much. The Village does not impose any upper limits on financial ability and does accept wealthy persons. The amount of the "donation" or fee for residency is determined by the Village's projection of the costs of operating the facility.

Rarely does a person enter the nursing home who has not been a resident of the towers, townhouses, cottages or efficiency apartments. If someone does directly enter the nursing wing, there is a charge of $37.00 per day plus meals. All persons residing in any part of the Village pay for prescription drugs.

Dr. O.H. Oliveira, a licensed clinical psychologist, presented testimony as an expert in geriatrics and gerontology on the problems of aging. Dr. Oliveira testified that the Village addresses special needs of the elderly by furnishing residents with opportunities for recreation, social activities and spiritual growth.

In the absence of a community environment, isolation and loneliness can lead to health problems for the elderly including dizziness, chest pains, headaches and loss of memory. Dr. Oliveira testified that these health problems associated with isolation occur far less frequently where el-

derly people live in a community environment and have ready access to social interaction. Persons living independent of such a community statistically do not live as long, suffer more health problems, and are hospitalized for medical problems longer than persons living in a structured environment such as that provided by Appalachian Christian Village.

### Exemption from Property Taxation

Article 2, § 28 of the Constitution of the State of Tennessee provides that "all property real, personal or mixed shall be subject to taxation, but the Legislature may except ... such as may be held and used for purposes purely religious, charitable, scientific, literary or educational, ..."

The legislature exercised their power to grant a tax exemption by enacting Tenn. Code Ann. § 67–5–212 (1989) which states:

(a)(1) There shall be exempt from property taxation the real and personal property, or any part thereof, owned by any religious, charitable, scientific or nonprofit educational institution which is occupied and used by such institution or its officers purely and exclusively for carrying out thereupon one or more of the purposes for which the institution was created or exists....

■ We should point out that in this state the exemption in favor of a religious, scientific, literary, or educational institution is liberally construed, *Mid–State Baptist Hospital, Inc. v. City of Nashville*, 211 Tenn. 599, 366 S.W.2d 769 (1963), whereas there is a presumption against exempting other property from taxation. *United Canners, Inc. v. King*, 696 S.W.2d 525 (Tenn.1985).

The plaintiff claims that its property is entitled to an exemption as religious and/or charitable property; that is, because the property is used purely and exclusively for those purposes.

### Religious Exemption

■ A religious institution's realty is exempt from property taxation only when it is both occupied and used exclusively by the institution for one of its charter purposes, and the exemption is denied not only to property leased by it to others, but also to property occupied by it but not used exclusively for a charter purpose. *City of Nashville v. State Board of Equalization*, 210 Tenn. 587, 360 S.W.2d 458 (1962).

■ Conceding that the plaintiff may be a religious institution, we do not think that the property in question is used purely and exclusively for a religious purpose. "The exclusive use requirement has been interpreted to refer to the direct, physical use of property ..." *Book Agents of Methodist Episcopal Church South v. State Board of Equalization*, 513 S.W.2d 514, 523 (Tenn.1974). In another case, the receipt of rent disqualified the property from an exemption under Tenn.Code Ann. § 67–5–212. In *City of Nashville v. State Board of Equalization*, parts of a religious institution's realty used by it for purposes of operating an automobile parking lot, a cafeteria and a snack bar were not "used exclusively" for a religious purpose, within the exemption provisions of the statute.

In *Tusculum College v. State Bd. of Equalization*, 600 S.W.2d 739 (Tenn.App. 1980), the court held that where college-owned residences were occupied for residential purposes and not for purposes of student instruction, and where the college received rent from all occupants other than the president, the property was not exempt from property taxes under Tenn.Code Ann. § 67–5–212 except for one-half of the president's home found to be used for college purposes.

The residents of Appalachian Christian Village pay substantial sums of money to live in the Village. In addition, the towers, townhouses, cottages and efficiency apartments are occupied primarily for residential purposes and not to further any religious purpose within the meaning of the statute.

We agree with the chancellor that the chapel is the only part of the Village which qualifies for the religious exemption.

### Charitable Exemption

■ A charitable institution is defined in Tenn.Code Ann. § 67–5–212(c) as "any non-

profit organization or association devoting its efforts and property, or any portion thereof, exclusively to the improvement of human rights and/or conditions in the community." Again, we would concede, for the purposes of argument, that the plaintiff as an institution fits the statutory definition. That, however, completes only the first step toward a finding that the plaintiff's property is exempt from taxation.

The next step is to determine if the use it makes of its property is purely and exclusively charitable. *North Gates Elks Club v. Garner*, 496 S.W.2d 887 (Tenn.1973).

■ While the plaintiff argues that Tenn.Code Ann. § 67–5–212(c) makes the use of its property a charitable one, we think the statute refers only to what constitutes a charitable organization and not to what is a charitable use. If the plaintiff's contention were to be followed then any number of retirement villages could be said to be devoting their property to a charitable use.

The Tennessee Supreme Court defined charity in *Baptist Hospital v. City of Nashville*, 156 Tenn. 589, 3 S.W.2d 1059 (1928):

> A precise and complete definition of a legal charity is hardly to be found in the books, but it is certain that in legal parlance the word "charity" has a much wider significance than in common speech. Probably the most comprehensive and carefully drawn definition of a charity that has ever been formulated is that it is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature. Another definition capable of being easily understood and applied is that given by Lord Camden as follows: "A gift to a general public use, which extends to the poor as well as the rich." The theory of this is that the immediate persons benefited may be of a particular class, and yet if the use is public in the sense that it promotes the general welfare in some way, it has the essentials of a charity. Again, charity has been declared to be active goodness; the doing good to our fellow men, fostering those institutions that are established to relieve pain, to prevent suffering, and to do good to mankind in general, or to any class or portion of mankind.

*Id.* at 592–93, 3 S.W.2d at 1060 quoted in *Downtown Hosp. Ass'n v. State Board of Equalization*, 760 S.W.2d 954, 956 (Tenn. App.1988).

Although Appalachian Christian Village serves the elderly by providing a community in which their special needs can be met, it extends this benefit selectively. The "donations" and rent required are substantial and there has been only one example of subsidization given by the plaintiff. Applications for admission to the Village are scrutinized for financial ability as well as moral character and physical condition. Rarely is a resident directly admitted into the nursing facility. Thus, though the benefits of the Village are significant, only those who are financially and physically well off can receive them. Those less healthy and wealthy are not benefited.

■ Although it is true that a charitable institution does not lose its charitable character and exemption from taxation because financially able patients are required to pay, *Baptist Hospital v. City of Nashville*, 156 Tenn. 589, 3 S.W.2d 1059 (1928), in this case financially disabled members of the public are effectively excluded from the benefits provided by the plaintiff.

For these reasons, we do not believe the Village's property is used purely and exclusively for a charitable purpose.

Our review of the record indicates that the chancellor was correct in finding that the decision of the Assessment Appeals Commission denying the exemption of the

plaintiff's property, except for the chapel and nursing facility, was supported by substantial and material evidence in the record.

The judgment of the court below is affirmed and the cause is remanded to the Chancery Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant.

KOCH, J., and JOE C. LOSER, JR., Special Judge, concur.